Barbara GESS, et al., Joseph Givens, et al., Patrick G. Roberts, et al., Teresa Fowler, et al., David Barber, et al., Jay Dehaai, et al., Cheryl Pretiger Toms, et al., Alphonso Barnes, et al., Joseph Warrick, et al., Connie Mullen, et al., Donald Gregory Sharpe, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civil Action Nos. 93–D–0913–N, 93–D–1140–N, 93–D–1391–N to 93–D–1395–N, 94–D–0326–N and 94–D–1199–N to 94–D–1201–N.

United States District Court,
M.D. Alabama,
Northern Division.

Dec. 6, 1996.

578, 585 (11th Cir.1989); *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 597 (11th Cir.1987).

George L. Beck, Jr., W. Terry Travis, L. Gilbert Kendrick, Randolph B. Moore, Montgomery, AL, for plaintiffs.

Kenneth E. Vines, Leura J. Garrett, U.S. Attorney's Office, Montgomery, AL, Gail K. Johnson, Heather S. Call, Lawrence A. Klinger, U.S. Dept. of Justice, Washington, DC, for defendant.

## MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Eight years ago, in February of 1988, the first in a series of alarmingly similar "emergencies" arose in the obstetrics ward of the Air University Regional Hospital at Maxwell Air Force Base in Montgomery, Alabama ("Hospital"). A newborn child, seemingly in excellent health, suddenly stops breathing and turns blue. Fortunately, the child survives. Unfortunately however, the medical implications of this episode, which occurred during a critically sensitive developmental period, may be far from fortunate.

Over the next ten months this "emergency" would repeat itself at least eleven times.[1] The plaintiffs in this case,[2] eleven infants and one adult (Cheryl Pretiger Schoen–Toms), all suddenly and for no medically explainable reason, crashed from good health to the brink of death. In the ensuing effort to provide an explanation for these events, several consistent and telling facts emerged. First, each of these plaintiffs was under the exclusive care of the Hospital when the life threatening events occurred. Second, a certain medical technician, Michael Beckelic ("Beckelic"), was on duty and had some interaction with *each* of the plaintiffs shortly before the "emergencies" arose. Third, Beckelic always seemed to be the first one on the scene—the one to "discover" and come to the "rescue" of the plaintiffs. Fourth, once the plaintiffs were transferred from the Hospital to nearby Baptist Medical Center ("BMC"), they experienced no more life threatening events. Finally, once Beckelic was removed from the Hospital obstetrics ward, the "emergencies" ended.

Medical experts would later opine that the experiences of the plaintiffs were consistent with the injection of toxic doses of lidocaine or some other similar drug. Unfortunately, newborn babies make poor witnesses; only

---

1. The Court will confine its discussion to the factual accounts of the plaintiffs in this case. The evidence indicates that there were at least twenty-three infants in the Hospital nursery who experienced these acute life threatening events (ALTE's) during 1988. However, the evidence adduced by the plaintiffs here, is so overwhelm-ing that the Court need not rely on the medical experiences of patients not part of this suit to bolster the Court's findings.

2. The plaintiffs include family members and others with derivative claims.

the adult plaintiff could testify directly about her experience (and her testimony is consistent with the toxic injection theory advanced by the plaintiffs). Nevertheless, the circumstantial evidence in this case obviates the need for the direct testimony of the infant plaintiffs.[3]

Too similar to be mere coincidence, in November of 1988 the Office of Special Investigation (OSI) for the United States Air Force began to investigate the alarming events at the Hospital. In the course of its investigation OSI contacted several medical experts: Lieutenant Colonel (Dr.) William F. Walsh, Chief of Neonatology, USAF Medical Center, Keesler Air Force Base; Colonel (Dr.) William H. Stigelman, Consultant for Clinical Pharmacy for the United States Air Force, Biomedical Service Corps; M. Gail Murphy, Division of Experimental Therapeutics of WRAIR; Colonel (Dr.) Robert Jones, Hospital Commander, presently Air Surgeon for the National Guard Bureau at Andrews Air Force Base; and Colonel (Dr.) Stanford P. Sadick, an osteopathic surgeon who was, at the time in question, Director of Hospital Services and head of Quality Assurance at the Hospital. OSI relied on these doctors and an independent review of Hospital records to generate a final report ("OSI report") setting out its findings.

Included in the OSI report was a statistical analysis of the events which took place in the Hospital. During 1988, more than six percent of the newborns at the Hospital experienced life threatening events. The pediatric population as a whole experiences life threatening events at the rate of 13/100 of one percent. With respect to Beckelic's role, after determining that Beckelic was the only one on duty when each of these incidents occurred, OSI calculated that the chance of this being mere coincidence was one in ten million. Further, the OSI noted that after Beckelic was removed from the Hospital nursery, all life threatening events stopped.

The compelling OSI report and an independent investigation led the Air Force, in January of 1989, to publicly state: "We believe the symptoms displayed by 13 of the infants were caused either accidentally or intentionally and were not the result of infection or medical procedures employed at the birth of the children."[4] The findings in the OSI report reverberated all the way to the Office of the Surgeon General of the Air Force in Washington, D.C. The Surgeon General let it be known that the Air Force would "take care" of these plaintiffs and their families. Astoundingly, not only does the United States of America ("defendant") now contest the claims of these plaintiffs it promised to "take care" of, but the defendant is guilty of directly impeding, through the destruction or redaction of critical evidence, the plaintiffs' ability to establish their claims.[5]

On July 22, 1993, the first of the plaintiffs filed suit. Subsequent suits were consolidated with the first, and twelve plaintiffs proceeded to trial alleging that the defendant, pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2401, *et seq.*, is liable for the injuries the plaintiffs suffered while

---

**3.** The Court charges jury after jury, after defining circumstantial evidence, that they may receive and consider circumstantial evidence the same as direct evidence. Routinely, the Court recites to the jury an example of circumstantial evidence learned from the Honorable Frank M. Johnson, Jr., some fifty years ago, while the undersigned was an assistant U.S. Attorney, viz.:

> If you go to sleep tonight and wake up in the morning and look out the window and see snow on the ground and rabbit tracks on the snow; you didn't see it snow, so it's not direct evidence; you didn't see a rabbit walk across the snow after it snowed, so it's not direct evidence; but you just know because you may *infer* from what you do see that while you were asleep it must have snowed and after it snowed a rabbit must have walked across the snow.

This case is replete with rabbit tracks across the snow all pointing to the negligence of the defendant.

**4.** It is unclear to the Court whether the Air Force conducted an Article 32 Uniform Code of Military Justice Investigation into this matter for the purpose of preferring charges against Beckelic. However, in light of the investigation the Air Force did conduct, the Court is at a loss to understand why charges were not preferred for a General Court Martial against Beckelic. Further, the Court notes that the Air Force failed to confer with the U.S. Attorney about this situation as required by the Memorandum of Understanding between the Departments of Justice and Defense.

**5.** *See* note 51 *infra.*

at the Hospital. The plaintiffs claim they have suffered injuries as the result of being maliciously injected with toxic doses of lidocaine or other similar drugs. The plaintiffs contend that the defendant owed them a duty of care in the hiring and supervision of Beckelic, a duty to promptly and reasonably discover, and act to prevent, foreseeable life-threatening events, and a duty to have in place a properly functioning quality assurance program. The Court has limited its initial assessment to the existence of such a duty, and to whether the duty, if any, has been breached.[6] Upon careful consideration of the evidence, the arguments of counsel, and the relevant case law, the Court finds that the defendant has breached its duty of care owed to the plaintiffs.

## I. BACKGROUND

The Court conducted a non-jury trial from July 8–12, 1996. During the trial, the plaintiffs argued that their injuries were caused by the deliberate "tampering" of Michael Beckelic. The plaintiffs presented evidence in support of three theories of liability: (1) that the defendant was negligent in the hiring and supervision of Beckelic, (2) that the defendant was generally negligent in the operation of the Hospital, and (3) that the Hospital was negligent in failing to prevent foreseeable criminal acts.

The plaintiffs' first step towards proving any of these theories was to establish that Beckelic's tampering caused their injuries, and thus, link the plaintiffs' injuries with the defendant's negligence.[7] In support of their contention, the plaintiffs rely heavily on the OSI report,[8] which includes the factual findings and opinions of the aforementioned doctors,[9] and the deposition testimony of Dr. Richard Colan.[10]

---

6. The Court will appoint a special master to decide the separate issues of proximate cause and damages.

7. Indeed, although the Court had intended the trial to focus on issues of duty and breach, much of the evidence focused on issues of causation. The defendant's primary defense appears to be that the plaintiffs' injuries had medically explainable causes (i.e., they were not caused by the tampering of Beckelic or any other member of the Hospital staff), and thus, even if the defendant was negligent, its negligence did not injure the plaintiffs.

8. The parties have previously submitted briefs regarding the admissibility of the OSI report. After careful consideration of the arguments of the parties, the court finds that the OSI report is either not hearsay within the meaning of Rule 801(d)(2)(C), *Federal Rules of Evidence*, or, in the alternative, falls within the hearsay exception set out in Rule 803(8)(C). The Court finds that the report is a reliable document. The report was conducted consistent with Air Force policy, reviewed for trustworthiness and was never contradicted by the United States Government. Pl.'s Ex. 199, Lashy Depo. at 4–9, 12, 15, 17–18 and 19–21. Accordingly, the Court finds that the OSI report is an admissible document.

9. The defendant has previously requested that the Court exclude from evidence the reports of Dr. Walsh and Dr. Stigelman on the grounds that these reports are quality assurance documents. These and other reports have been incorporated into the OSI report which the Court has found to be admissible.

The Court's finding that the defendant failed to conduct a quality assurance investigation in conjunction with the events occurring at the Hospital in 1988, *see* discussion of negligence *infra*, supports the conclusion that the reports of these doctors were not quality assurance documents. In light of the defendant's failure to conduct a quality assurance investigation when it was most needed, the Court is skeptical about the defendant's convenient assertion that proper quality assurance procedures were followed in the aftermath of the incidents at the Hospital. Furthermore, the deposition testimony of Drs. Walsh and Stigelman, and particularly, the testimony of Hospital Commander, Colonel Jones, convince the Court that these reports were not part of a quality assurance investigation. *See* Pl.'s Ex. 58, Jones Depo. at 57–59, 76–85; Pl.'s Ex. 64, Walsh Depo. at 19–26, 37–39; Pl.'s Ex. 51, Stigelman Depo. at 31–36, 40–46. The OSI report was part of a criminal investigation. The reports of these doctors were not maintained separately from the OSI report. The Court finds that these doctors reports are admissible.

10. The defendant contends that Dr. Colan's testimony does not meet the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Joiner v. General Electric Co.*, 78 F.3d 524 (11th Cir.1996). *Daubert* provides that "the trial judge must insure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." To be reliable the subject of an expert's testimony must be scientific knowledge, that which is derived from a body of known facts, a body of ideas inferred from such facts, or which is accepted as true on good ground. 509 U.S. at 589, 113 S.Ct. at 2795. Relevance re-

Upon consideration of all the evidence, the Court finds that each of the plaintiffs have established, by a preponderance of the evidence, that they were injured by the malicious acts of Beckelic. The plaintiffs pre-sented extensive "general" (non-individual-ized) evidence from which the Court finds that plaintiffs established, prima facie, that their injuries stemmed from non-medical causes.[11] To this end, Dr. Colan[12] was un-

quires that the evidence or testimony "assists the trier of facts to understand the evidence or to determine a fact in issue." *Id.* (internal quotations omitted).

The Court finds that Dr. Colan's testimony complies with the requirements of *Daubert.* Dr. Colan's testimony, that the plaintiffs, while they were patients at the Hospital, were tampered with through the surreptitious injection of lido-caine or other similar drug, is based upon the record medical evidence pertaining to the plain-tiffs, his own examination of the plaintiffs, and other record evidence pertaining to the plaintiffs' care while in the Hospital. Dr. Colan's knowl-edge of lidocaine toxicity is derived from, and supported by, at least thirteen peer-reviewed arti-cles. He couples this record evidence with his knowledge of lidocaine toxicity to reach his con-clusions regarding the plaintiffs' injuries suffered in the Hospital. Thus, the Court finds that Dr. Colan's testimony is reliable within the meaning of *Daubert.* Further, Dr. Colan's testimony is relevant to the issue of causation, a necessary element of the plaintiffs' claims. Accordingly, Dr. Colan's testimony is admissible as expert testimony within the meaning of *Daubert.*

11. This evidence includes Dr. Walsh's report to the OSI. Dr. Walsh categorized the infants who had suffered life threatening events at the Hospi-tal, into three groups. Group A included those infants whose problems were entirely medically explainable. None of the Plaintiffs are in this group. Group B consists of those who had prob-lems of a suspicious nature but with *possible* medical explanation. Plaintiffs Warrick and Em-ily Roberts fall into this category. Group C con-sists of those whose medical problems suffered while patients at Maxwell *had no medically ex-plainable causes.* Plaintiffs Gess, Givens, Fowl-er, James (Barnes), John Roberts, Sharpe, Bar-ber, DeHaai, and the adult plaintiff, Pretiger were categorized as "C" patients by Dr. Walsh.

Dr. Walsh reviewed the medical records of all infants who had critical episodes during the peri-od June through November, 1988. These rec-ords included the Hospital records as well as records from BMC where applicable. Addition-ally, Dr. Walsh reviewed the records of another 197 infants born at the Hospital during that same period. As a result of his study, evaluation and analysis of all the medical records, Dr. Walsh concluded that the most likely cause of their injury was a drug administered either intrave-nously or intramuscularly. *See* Pl.'s Ex. 8, Dr. Walsh's Report to OSI Investigation dated 12/6/88, OSI Report; Pl.'s Ex. 162., Walsh Letter dated 2/10/89.

Dr. Stigelman's report to the OSI was consis-tent with Dr. Walsh's. Dr. Stigelman agreed with Dr. Walsh's patient classifications. Except for plaintiffs Fowler and James, Dr. Stigelman agreed that the plaintiffs' injuries "as document-ed in their medical records [are] most consistent with the surreptitious administration of some exogenous agent." Pl.'s Ex. 163, Dr. Stigelman Letter dated 12/27/89. Dr. Stigelman opined: "Lidocaine or bupivicaine, if given in toxic quan-tities, would fit the clinical picture seen in each of these patients." *Id.* at 3. Dr. Stigelman based his conclusion on a review of the medical records of twenty-two infants and twenty-three mothers, along with Dr. Walsh's consultant re-ports dated December 6, 1988 and February 10, 1989. He also reviewed documents from the Alabama Reference Laboratory and the OSI vid-eotape interview with the Pretiger mother.

Colonel Jones, the Hospital Commander, to his everlasting credit, offered his medical and hospi-tal administrative opinion that the baby plaintiffs were tampered with, whether by a drug or sim-ply by smothering. He believes that simply cup-ping the hand over the face and nose would also stop the plaintiffs' breathing and cause cyanosis. Pl.'s Ex. 58, Jones Depo. at 63, 64.

In the course of investigating the incidents at the Hospital, Dr. Sadick first ruled out bacterial or viral contamination of the nursery as well as contamination of medication. Pl.'s Ex. 53, Sad-ick Depo. at 21, 22. Dr. Sadick, after exhausting all other alternatives, concluded "that a hospital employee's willful misconduct was the source of the problem." Pl.'s Ex. 101, Sadick Aff. dated 6/29/94.

12. Unlike the experts for the defendant, Dr. Co-lan based his opinion on all available relevant information. Dr. Colan physically examined the plaintiffs, examined the plaintiffs' medical rec-ords, examined the medical records of non-plain-tiffs who suffered acute life threatening events at the Hospital in 1988, and conducted an extensive review of medical literature on lidocaine toxicity. Pl.'s Ex. 70, Colan Depo., dated 3/3/94, at 14–17, 142–171. Dr. Colan testified that he searched the literature for studies inconsistent with this theory, but "did not find any published article that suggested the reverse." Pl.'s Ex. 71, Colan Depo., dated 6/6/94, at 54. Significantly, in for-mulating his opinion, Dr. Colan studied the OSI report, the reports of Drs. Walsh, Stigelman and Murphy, the deposition testimony of Colonel Jones and Colonel Sadick, the deposition testi-mony of the defendant's expert Dr. Roberts, and the testimony of the defendant's expert Dr. Snead.

Dr. Colan testified that in his expert opinion, and to a reasonable degree of medical certainty, all of the Plaintiffs had been tampered with while

equivocal in his opinion that, given the huge statistical improbability that the events at the Hospital resulted from natural causes,[13] and given the uniformity of symptoms among the plaintiffs,[14] the plaintiffs' injuries resulted from intentional tampering. Pl.'s Ex. 70, Dr. Colan Depo., dated 3/3/94, at 18, 19, 172, 173. Plaintiffs also have put before the Court evidence which is more than sufficient to conclude that, as to each individual plaintiff, Beckelic's intentional acts contributed or caused the plaintiffs to experience life-threatening events while at the Hospital. *See infra* § II (Plaintiffs).

The defendant asserts that the injuries suffered by the plaintiffs resulted from medically explainable causes. Thus, despite several public statements to the contrary,[15] the Government now contends that none of the plaintiffs' injuries are the result of a surreptitious injection of lidocaine or other similar drug. To support its position, the Government offered the testimony of Dr. Robert J. Roberts and Dr. Carter Snead.[16] Although the Court initially found that these doctors were qualified as "experts," the Court finds that the testimony of these doctors is not credible. Particularly disturbing to the Court was that both of these doctors based their opinions on limited information[17]; they did not consider all of the relevant facts surrounding the incidents at the Hospital. In essence the defendant's experts reviewed the plaintiffs' medical records, drew conclu-

---

patients at the Hospital, most of them by the surreptitious injection of the drug lidocaine. Dr. Colan's opinion is supported by the findings in the OSI report and is in agreement with the conclusions of every other medical doctor or pharmacologist who examined the Hospital incidents, with the exception of the Government's two paid experts, Dr. Roberts and Dr. Snead.

13. Comparing the number of "acute life threatening events" ("ALTE") that occurred among the Hospital's pediatric population in 1988 with the number that occurred in the hospitalized pediatric population as a whole, Dr. Colan found that infants at the Hospital were between 20 times and 140 times more likely to suffer an ALTE. This increased likelihood of suffering an ALTE at the Hospital correlates to less than a 1 in 100,000 chance that such ALTE happened by random occurrence.

Dr. Colan also noted that the incidence of hemiparesis cerebral palsy in the Hospital babies is "4,000 times higher than we would expect on random chance alone." Five of the plaintiffs have this unusual form of cerebral palsy. He further testified that speech problems are twenty times higher than that seen in the pediatric population as a whole. Colan Depo., 3/3/94, at 151, 152, Pl.'s Ex. 70.

14. Dr. Colan's belief that events at the Hospital were not the result of mere coincidence was buttressed by the fact that all the children suffering ALTEs displayed the same or similar symptoms. Dr. Colan stated, "[i]t is inconceivable that these are random occurrences." Pl.'s Ex. 70, Colan Depo., dated 3/3/94, at 128.

Dr. Colan found that the pattern of symptoms displayed by the infants at the Hospital suffering acute life-threatening events was indicative of lidocaine poisoning (or in the case of plaintiffs Goggans and Roberts, the injection of a toxic dose of some other exogenous agent). Dr. Colan states to a reasonable degree of medical certainty that a non-therapeutic dose of lidocaine can act as a neurotoxin, particularly in newborn infants whose brains are in the process of developing. Further, the acute symptoms exhibited by the Plaintiffs are the same as those symptoms exhibited by someone who has been exposed to a nontherapeutic or toxic dose of lidocaine, i.e., cardiac irregularity (bradycardia, tachycardia), respiratory distress (apnea), cyanosis (blue or dusky colored pallor to the skin), metabolic acidosis, hyperglycemia (high blood sugar), and depending on the dosage, jitteriness, tremors or seizures. Pl.'s Ex. 71, Colan Depo., dated 6/6/94, at 124–128; Pl.'s Exs. 77, 78, 94, 95. Dr. Colan testified that nine of the thirteen plaintiffs and most of the non-plaintiffs suffering ALTE's whose medical records he examined exhibited these same symptoms.

15. *See supra* p. 1533. Colonel Sadick, head of Quality Assurance at the Hospital, called many of the plaintiffs' parents. Colonel Sadick informed many parents that their child was part of a "tampering" incident, or that their child was suspected of being a victim of foul play in the nursery. Although he doesn't remember everything he said to the parents, his notes clearly reflect that he informed some of the parents that their babies had been injected. *See* Pl.'s Ex. 53, Sadick Depo. at 29–32, 44–51; Pl.'s Ex. 62, Ratliff Depo. at 17–19, 25, 26.

16. Dr. Roberts reviewed the medical records of all infant plaintiffs and expressed an opinion as to the cause of their injuries. *See* Tr. at 706. Dr. Snead only reviewed the medical records of five plaintiffs, Camoi James, Aaron Goggans, Quinton Warrick, Raschel Givens, and Asia Sharpe. *Id.* at 856, 921–22.

17. The information was, not surprisingly, selected by the Government. *See* Tr. at 924.

sions, and formed opinions in a "vacuum."[18] These witnesses simply discounted or ignored far too much relevant and available information for their opinions to carry significant weight with the Court.

Ironically, the one person who could, perhaps, have shed the most light on the events at the Hospital did not testify. The Court has serious questions as to why the defendant failed to call Beckelic as a witness in this case.[19] Based on the Government's failure to call Beckelic, the Court finds that Beckelic's testimony would have been harmful to the Government's case. *See Donaldson v. Buck*, 333 So.2d 786, 787–89 (Ala. 1976).[20]

---

18. Although it is apparent that Dr. Roberts reviewed more information than Dr. Snead, the Court finds that Dr. Roberts intentionally omitted the review of numerous relevant documents. Dr. Roberts did not want to look at "additional information outside [his] area of expertise." Tr. at 788. However, the Court cannot understand how the opinions and conclusions of other doctors, doctors who were attempting to answer the same questions that were posed to Dr. Roberts, would be anything but helpful to Dr. Roberts. *See* Tr. at 811 (stating that he deliberately avoided looking at the OSI report, and thus, the doctors' reports contained therein).

Furthermore, Dr. Roberts declined to offer an opinion as to whether Plaintiffs' symptoms were consistent with lidocaine poisoning. Pl.'s Ex. 61, Roberts Depo. at 103, 110, 125, 143, 147, 168, 172 and 181. Significantly, Dr. Roberts did not rule out tampering. *Id.* at 128.

Dr. Snead's narrow review of the relevant evidence was glaring. Dr. Snead appeared, to the Court, arrogant in his position of absolute correctness. In fact, Dr. Snead seemed almost contemptuous of the suggestion that he should have reviewed other evidence including the opinions and conclusions of the other doctors who reviewed the evidence. A few examples from the trial will illustrate the Court's concern:

Q. If you had wanted to look at the records of these other injured children [the other plaintiffs] you have had ample opportunity to do that. I understood your testimony to be the reason you didn't do it initially is because of the press of time, that you had a short period of time in which to prepare your testimony, that's no longer the case; isn't that true?

A. You asked if I knew why the government—you asked me—what you asked me was why these—if I knew why these five kids were selected, and I told you my understanding from talking to the government. I did what I was asked to do, they asked me to look at these five children and that's who I looked at.

Tr. at 924. It is precisely this fact that concerns the Court. If relevant information is not before a person who intends to offer an "expert" opinion, it would seem incumbent upon that person to attempt to gain access to such information. The Court does not agree with Dr. Snead that what happened to other Hospital patients is irrelevant to what happened to the five plaintiffs whose medical records Dr. Snead reviewed. One does not have to have an M.D. to realize that a pattern of events discerned from the records of a number of individuals can help provide insight as to what happened to a single individual within the same environment. For example, if an entire town exhibits symptoms of the bubonic plague, this information is undoubtedly relevant to a physician's evaluation of a single person from within that town.

Not only did Dr. Snead feel that the records of other Hospital patients were irrelevant to his evaluation, he felt that the conclusions reached by other doctors, doctors whose opinions were formed at a time much closer to the events in question, were irrelevant.

Q. Okay. Doctor, the OSI report contained in it the reports of physicians and pharmacologists who had set out to answer the same question that you were hired to answer; are you aware of that?

A. Yes.

Q. Wouldn't their conclusions, their findings, their opinions and the basis therefore, be relevant to what you were attempting to do?

A. No.

Q. You don't care about what they did, done at the time as opposed to your doing it seven or eight years later, you don't even want to know what they did or what kind of conclusions they reached, in trying to recreate?

A. Not particularly.

Tr. at 943. The Court finds that Dr. Snead is not a credible witness.

19. The defendant informally represented to the Court that it could not call Beckelic because it could not "find" him. Given the vast resources the Government has at its disposal, the Court was quite shocked when it was informed by its law clerk that Beckelic, or someone with exactly the same name, was living in California. Upon further inquiry, the Court learned that its law clerk was able to access Beckelic's California address, the equity value of his home, and the names of several of Beckelic's neighbors, in a computer search that required less than five minutes to complete.

20. In this case, the Court expects that Beckelic would testify to the effect that he did not inject the plaintiffs with toxic doses of lidocaine or other similar drugs. Such testimony is completely congruous with the Government's position, i.e. the plaintiff's injuries did not result from the surreptitious injection of exogenous agents. Under these circumstances, Beckelic is more available as a witness to the Government, and thus, the Court, as the finder of fact, is free

Despite the fact that he did not appear at the trial, the Court has learned a great deal about medical technician Beckelic. Beckelic spent six weeks in a mental hospital in 1984, just prior to being inducted into the Air Force. He was hospitalized at Peninsula Psychiatric Hospital from January of 1984 through February of 1984, where he was treated for severe depression. At age 17 he was allowed into the Air Force. Dr. Wesley B. Carter assessed Beckelic's judgment as being "grossly within normal limits." He added that "he saw no gross evidence of significant psychopathology, which would *definitely* contraindicate his induction." Pl.'s Ex. 21, Op. of Dr. Wesley B. Carter dated 2/28/85, Beckelic's Medical Treatment File.[21]

After induction, Beckelic's mental instability appears to have accelerated. Beckelic sought mental or physical medical attention some fifty times between his induction at age 17 in 1985 and the injury to the last plaintiff baby in December 1988. Pl.'s Ex. 236–246, Beckelic Medical Records.

During 1988, the year the plaintiffs were injured, Beckelic's wife revealed to Beckelic's immediate supervisor, Denise Womack, that she was afraid of Beckelic because of his temper tantrums. Beckelic would become very angry and hit her or the walls of their home. His temper was uncontrollable and he suffered temper outbursts at home over little things. Pl.'s Ex. 54, Womack Depo. at 78–80.

Beckelic was referred to mental health counseling where he was diagnosed as having an "intermittent explosive disorder." Although he claimed that he had no problems with his temper at work, Beckelic admitted that he had problems controlling his temper and that he frequently became angry. Pl.'s Ex. 8, OSI Report at 37; Pl.'s Exs. 243–246, Mental Health Records. In group therapy on June 10, 1988, Beckelic commented, "I don't know what's happening to me. I feel out of control. I can't even control my emotions." Pl.'s Exs. 242, 243, Mental Health

Records dated 6/10/88. His problem was diagnosed as an "inability to control [ ] outbursts of anger and consequential interpersonal problems." Pl.'s Ex. 242–246, Mental Health Records dated 6/88. Beckelic also admitted yelling at people, kicking walls and expressing violence to people. Pl.'s Exs. 242, 243, Mental Health Records dated 6/10/88.

Beckelic's behavior at the Hospital struck many of his co-employees and supervisors as odd. Beckelic was described as fishing for compliments, overeager, under stress, nosey, craving attention, over-emotional, and hyper. *See* OSI report at 18–31. It appears therefore, that Beckelic's mental and emotional health issues impacted both his personal life and work performance.

## JURISDICTION & VENUE

Subject-matter jurisdiction is proper pursuant to 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the ... laws ... of the United States." 28 U.S.C. § 1331. Personal jurisdiction and venue are not contested.

## STANDARD OF REVIEW

■ The burden of proof in civil cases is the same regardless of whether the finder of fact is a judge in a bench trial or a jury. *Cabrera v. Jakabovitz*, 24 F.3d 372, 380 (2d Cir.), *cert. denied*, 513 U.S. 876, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994). That is, a plaintiff bears the burden of satisfying the finder of fact that he or she has proven every element of his or her claim by a preponderance of the evidence. A preponderance of the evidence means such evidence as, when considered with that opposed to it, has more convincing force, and demonstrates that what is sought to be proved "is more likely true than not true." *See Pattern Jury Instructions*, Basic Instruction No. 6.1, U.S. Eleventh Circuit District Judges Association (Civil Cases) (1990).

to draw a negative inference from the Government's failure to call Beckelic as a witness. *Donaldson*, 333 So.2d at 788–89.

**21.** Of course, the simple fact that one is qualified to be part of an organization does not mean that

one is qualified to perform all tasks within that organization. The Air Force was expected to use reasonable discretion in determining which tasks and/or functions Beckelic should have been assigned to perform.

In bench trials, the judge serves as the sole fact-finder and, thus, assumes the role of the jury. In this capacity, the judge's function includes weighing the evidence, evaluating the credibility of witnesses, and deciding questions of fact, as well as issues of law. *Childrey v. Bennett,* 997 F.2d 830, 834 (11th Cir.1993) (holding that "it is the exclusive province of the judge in non-jury trials to assess the credibility of witnesses and to assign weight to their testimony").

Moreover, "a trial judge sitting without a jury is entitled to even greater latitude concerning the admission or exclusion of evidence." *Goodman v. Highlands Ins. Co.,* 607 F.2d 665, 668 (5th Cir.1979) (citing *Wright v. Southwest Bank,* 554 F.2d 661 (5th Cir.1977)),[22] *see Lee v. Russell County Bd. of Educ.,* 684 F.2d 769, 776 n. 5 (11th Cir.1982) (stating that the court has "broad discretion over the admission of evidence in a bench trial").

## II. THE PLAINTIFFS

Before discussing the plaintiffs' claims, the Court will lay out the factual background as it pertains to each of the individual plaintiffs.

### A. *CHERYL PRETIGER SCHOEN, Case No. 93–D–1201–N*

As noted earlier, only Cheryl Schoen (then Cheryl Pretiger) was able to provide direct testimony regarding the involvement of Beckelic in the tragic events which occurred at the Hospital. The Government's investigation into the Schoen (Pretiger) incident is summarized in the OSI Report as follows:

> On 1 November 1988, Cheryl Pretiger, a 24–year old post-operative patient on the OBN ward, suffered an unexplained respiratory failure. She had delivered a child at 0839 that morning by cesarean section (c-section) and was recovering in her room. At about 1700, she complained of itching, and McCarty, an OBN nurse, gave her an intramuscular (IM) injection of Benadryl as prescribed by her physician. At about 2130, her itching returned, and she told [Beckelic] (subsequently identified by her

via photograph) she had been given Benadryl earlier to combat the itching. [Beckelic] left the room and returned a short time later. Pretiger said [Beckelic] worked with (NFI) her ongoing IV apparatus, and she immediately experienced a sharp burning sensation around the wrist of her arm with the IV. She felt a strange feeling in her throat, coughed, and lost consciousness. McCarty said she entered the room as Pretiger was coughing, noted Pretiger had ceased breathing, and called the Code Blue. Subsequent examinations failed to disclose a medical or physiological cause for Pretiger's respiratory arrest. One consulting physician believed her reaction to medications given during resuscitation efforts was indicative of an individual who had been given an overdose of some narcotic. At least two consulting physicians discounted a reaction to the anesthesia Pretiger had been given during her surgery, citing a low dosage and the long period of time since the surgery as reasons to rule out a possible side effect. OBN duty rosters revealed [Beckelic] worked the evening shift on 1 Nov 88, the night Pretiger's event occurred, and duty rosters showed [Beckelic] was on duty during the shift when Pretiger's event occurred.

Pl.'s Ex. 8, OSI Report at p. 8, ¶ 3–11.

Mrs. Schoen described the incident in her affidavit given on March 17, 1993 as follows:

> That evening at approximately 9:00 p.m. my heart monitor went off. A technician came into my room to reset the monitor. While he was there, I requested Benadryl to relieve itching that I was experiencing. ... The technician left the room and when he returned, I noticed he had a syringe with him. I then saw him take my IV in one hand and he held the syringe in the other. The next thing I knew, the area around my hand started burning. I complained to the technician, who responded that this was 'normal.' The next thing I remember is violently coughing, at which time the technician told me to 'go with it.'

---

22. Decisions of the former Fifth Circuit filed prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

I became unconscious and the next thing I recall is after the incident was over.

Pl.'s Ex. 211, Schoen Aff. dated 3/17/93; Ex. 6A, at 1; *see also,* Pl.'s Ex. 188, Schoen Depo. at 6–11.

Mrs. Schoen's eyewitness account of Beckelic's involvement in her near-death experience was a significant factor in the Air Force's decision to initiate an OSI investigation. As the Government now admits: "[T]he Air Force Office of Special Investigation initiated an investigation based on … a recent unexplained respiratory arrest of an obstetric patient who subsequently identified a subject injecting a substance in her IV immediately prior to her arrest." Pl.'s Ex. 2, Government Admission No. 4, dated 4/28/94.

Drs. Walsh and Stigelman independently reviewed Mrs. Schoen's medical records following the incident. Both doctors concluded that, while they could not be absolutely certain about the substance used, Mrs. Schoen's shock-like state was very likely the result of a drug, lidocaine or other similar agent, administered intravenously or intramuscularly. *See* OSI Report. Dr. Colan, on the other hand, was more confident that Mrs. Schoen had been injected with lidocaine. Dr. Colan found that the combination of two symptoms exhibited by Mrs. Schoen, severe migraine headaches and gastrointestinal problems (constipation and diarrhea), strongly suggested Mrs. Schoen had been injected with lidocaine. None of the doctors believed Mrs. Schoen's incident could have been the result of natural biological causes.

It is undisputed that Beckelic was on duty and attended Mrs. Schoen at the time of her injury. OSI Report at p. 8; Pl.'s Ex. 188, Schoen Depo. at 5–12.; Pl.'s Ex. 99, Nursery Duty Roster.; Pl.'s Ex. 1, Government Admission No. 49, dated 1/19/94. The defendant admits that whatever happened to Mrs. Schoen happened while she was under the exclusive care, custody and control of the defendant. Pl.'s Ex. 3, Government Admission No. 21, dated 8/26/94.

It is further undisputed that despite this incident, there was no investigation, no incident report completed and no documentation on Mrs. Schoen's medical records.[23] Pl.'s Ex. 70, Dr. Colan Depo., dated 3/3/94, at 11, 12, 157–159; Pl.'s Ex. 56, Nellis Depo. at 226; Pl.'s Ex. 57, McPherson Depo. at 165–66, 225; Pl.'s Ex. 53, Sadick Depo. at 60, 84. No tests were run, and neither blood nor urine samples were taken and analyzed. Pl.'s Ex. 70, Dr. Colan Depo., dated 3/3/94, at 10; Pl.'s Ex. 57, McPherson Depo. at 225, 237–38; Pl.'s Ex. 53, Sadick Depo. at 61, 90. The OSI interview with Mrs. Schoen did not occur until more than thirty days after she was injected by Beckelic. Pl.'s Ex. 8, OSI Report at 1. As Dr. Colan observed, the Government had an "ethical, moral and medical" duty to include details of this incident in her medical records. Pl.'s Ex. 71, Dr. Colan Depo., dated 6/6/94, at 159.

The Court finds, upon consideration of all the evidence, that Mrs. Schoen was injured by the foreseeable actions of Beckelic.

### B. *TIFFANY BARBER, Case No. 93–D–1393–N*

The OSI Report summarizes the Air Force's investigation into the circumstances surrounding the injury to Tiffany Barber as follows:

A full-term, female infant born without complications via spontaneous vaginal delivery at 1913, 9 Jul 88. The mother had a history of herpes at 34 weeks of pregnancy, but all cultures had been negative since that time. The infant was stable until approximately 2130 when she was found to have bradycardia and cyanosis. A Code Blue was called, and the infant responded to oxygen and stimulation. Dr. Walsh, in his review, noted the infant was hyperglycemic and suffered from profound metabolic acidosis. The infant responded well to further treatment and had no reoccurrence of cyanosis, bradycardia, or hyperglycemia. The infant was not transferred to BMC. Dr. Stigelman characterized this infant's illness as consistent with lidocaine or bupi-

---

**23.** After moving to California, Ms. Schoen said that she tried on numerous occasions for approximately two years to obtain her medical records. When she finally received the medical records, there was no information contained in them about the injection of any type of drug in her I.V. by Michael Beckelic. Interestingly, this whole "chapter" was missing from her medical record.

vacaine toxicity. Dr. Walsh estimated the time of event to be 2130, 9 Jul 88 (the 9 Jul 88 evening shift). A nursing note (SF 510 Overprint) for 2100, 9 Jul 88, showed Subject's signature. Duty rosters showed Subject worked the 9 Jul 88 evening shift. Pl.'s Ex. 8, OSI Report.

A review by Dr. Walsh of the Barber medical records caused him to conclude that there was no medically explainable reason for the injury suffered by the Barber child. Pl.'s Ex. 162, Walsh Opinion; Pl.'s Ex. 8, OSI Report. Dr. Stigelman concluded that the Barber infant was likely injected with lidocaine or similar toxic substance. Pl.'s Ex. 163, Stigelman Opinion; Pl.'s Ex. 8, OSI Report, Ex. 4.

Dr. Colan agrees that the child's symptoms are consistent with the injection of lidocaine and that there is no other medically explainable reason for the injury. Pl.'s Ex. 70, Dr. Colan Depo., dated 3/3/94, at 17–19, 128, 135, 147, 148. Dr. Colan observed:

> Tiffany was a healthy term child with apgars of 7 and 8 ... About two hours post delivery at 2200 hours the child had an acute episode of apnea which means her breathing stopped; cyanosis, which means she turned blue; and decreased heart rate, although her heart did not stop. At that time, laboratory testing showed metabolic acidosis, which means that the acids were suddenly too great in her system and very significantly so. She was treated for that. Various studies did not prove any other cause or problem.
>
> There was also evidence for acute hyperglycemia which means sudden increase in blood sugar. That was very puzzling to the doctors at the time. They were unable to come to any conclusion about what on earth had gone on.

Pl.'s Ex. 8, Dr. Colan Depo., dated 3/3/94, at 55.

Mrs. Barber, the injured child's mother, recalls physically handing her baby to Beckelic shortly before the medical problems arose. Pl.'s Ex. 194, Barber Depo. at 5–7; *see also* Pl.'s Ex. 71, Dr. Colan Depo., dated 6/6/94, at 107. It is undisputed that Beckelic was on duty at the time the incident occurred. Pl.'s Ex. 99, Nursery Duty Roster; Pl.'s Ex. 100, Personnel Grid; Pl.'s Ex. 1, Government Admission Nos. 41 & 53, dated 1/19/94. Further, the defendant admits that whatever happened to infant Barber, happened while she was under the exclusive care, custody and control of the defendant. Pl.'s Ex. 3, Government Admission No. 21, dated 8/26/94.

The Court finds, upon consideration of all the evidence, that the Barber infant was injured by the foreseeable actions of Beckelic.

### C. *MELANIE GESS, Case No. 93–D–913–N*

The defendant's investigation into the incident of baby tampering involving Melanie Gess is summarized in the OSI Report as follows:

> A full-term, female infant born without complications via spontaneous vaginal delivery at 1557, 29 Jul 88, noted to be active and vigorous at birth. The mother had no prenatal care and was noted to have an untreated chlamydial infection. Although the amniotic fluid was meconium stained, the trachea was observed to have little meconium. The infant had no problems during the first hours of life. At about 0030, 30 Jul 88, [Beckelic] performed a routine newborn assessment and noted that her vital signs were within normal limits on AF Form 578. At approximately 0105, the infant was found pale and not breathing. This period of apnea (cessation of breathing) lasted for approximately 30 seconds. When tactile stimulation was ineffective, the infant was administered CPR, transferred to the IMI where oxygen was administered, and a Code Blue initiated. A breathing tube was inserted into the infant's lungs, and at 0120 she was breathing on her own. The infant was transported to BMC at 0425, 30 Jul 88. Dr. Stigelman believed that although the infant's symptoms were consistent with lidocaine or bupivacaine toxicity, the infant might have become ill as a result of meconium aspiration. He deferred to Dr. Walsh's opinion, however, since he was not a pediatrician. Dr. Walsh estimated this infant's event to have occurred at about

0100, 30 Jul 88 (the 29 Jul 88 night shift). As noted above, [Beckelic's] signature appeared on the AF 578 Data Record at 0030, 30 Jul 88. Duty rosters showed Beckelic worked the 29 Jul 88 night shift.

Pl.'s Ex. 8, OSI Report at 9, ¶¶ 3–11. After reviewing Gess's medical records, Dr. Walsh concluded that there was no medically explainable cause for her episode.

Dr. Colan agreed with Dr. Walsh that the Gess infant had been tampered with, and he further concluded that she had been injected with lidocaine. Pl.'s Ex. 70, Dr. Colan Depo., dated 3/3/94, at 17–19, 128, 136, 147, 148. Dr. Colan concluded that Melanie Gess:

experienced lidocaine toxicity that caused her to suffer apnea anoxia, acidosis, impaired circulation, respiratory distress and required transfer to another hospital regional extensive care unit for care.

... In addition, the poisoning has permanently altered her digestive and intestinal functioning causing early vomiting and chronic recurring abdominal problems, including abdominal distension, chronic constipation for prolonged periods, followed by a shorter period of severe diarrhea and subsequent return of chronic constipation and projectile vomiting.

... What we are talking about here is a pattern of impairment of intestinal motility in this child which expresses itself in a variety of different ways. I have told you and the court about the basis of understanding this as a sequaly of lidocaine intoxication.

Pl.'s Ex. 71, Dr. Colan Depo., dated 6/6/94, at 122. Dr. Colan also concluded that the same or similar symptoms in Mrs. Schoen provided additional evidence of lidocaine toxicity. Dr. Colan and Dr. Walsh rule out any question of stress caused by meconium stain. Dr. Stigelman concurs. Pl.'s Ex. 8, OSI Report.

Once again, it is undisputed that Beckelic was on duty at the time the Gess child was injured. Pl.'s Ex. 100, Personnel Grid; Pl.'s Ex. 99, Nursery Duty Roster; Pl.'s Ex. 1, Government Admission Nos. 20, 63, dated 1/29/94. The Government also admits that whatever happened to Melanie Gess happened while she was under the exclusive care, custody and control of the United States Government. Pl.'s Ex. 3, Government Admission No. 21, dated 8/26/94.

The Court finds, upon consideration of all the evidence, that the Gess infant was injured by the foreseeable actions of Beckelic.

### D. JENNIFER DEHAAI, Case No. 93–D–913–N

The defendant's investigation into the circumstances surrounding the injuries suffered by Jennifer DeHaai is summarized in the OSI Report as follows:

A full-term, female infant born without complications via spontaneous vaginal delivery at 1619, 11 Aug 88. At 0009, 12 Aug 88, [Beckelic] noted in the infant's record that her vital signs were stable, and her color, cry and activity were within normal limits. At 0130, it was noted that she was cyanotic with tachycardia and was coughing as if choking. She was placed on a cardiac monitor for the night. The next day, her vital signs were improved. She was discharged from AURH on 16 Aug 88. Dr. Stigelman opined this infant's symptoms were consistent with lidocaine or bupivacaine toxicity. Dr. Walsh estimated this infant's event to have occurred at about 0130, 12 Aug 88 (the 11 Aug 88 night shift). [Beckelic's] signature appears on a 12 Aug 88, 0009, nursing note (SF 510) in the infant's medical record. This infant was never transferred to BMC. Duty rosters showed Beckelic worked the 11 Aug 88 night shift.

Pl.'s Ex. 8, OSI Report at 10, 3–11. Dr. Walsh reviewed DeHaai's medical records and concluded that there were no medically explainable reasons for her injuries. Pl.'s Ex. 162, Walsh Report. Dr. Walsh opined that it was very likely that the DeHaai child had been either smothered or injected with some type of toxic or exogenous agent. Pl.'s Ex. 162, Walsh Report. The most likely explanation was a drug administered with IV or IM. Id. Dr. Stigelman concurred and concluded that "lidocaine or bupivicaine, if given in toxic quantities, would fit the clinical picture." Pl.'s Ex. 163, Walsh Report. Dr. Colan agreed that the symptoms experienced by Jennifer DeHaai were consistent with lidocaine toxicity. Pl.'s Ex. 70, Dr. Colan

Depo., dated 3/3/94, at 17–19, 135, 147, 148; Pl.'s Ex. 71, Dr. Colan Depo, dated 6/6/94, at 126–129, 135, 147, 148.

As indicated in the OSI report, it is undisputed that Beckelic was on duty at the time of DeHaai's injury. Pl.'s Ex. 100, Personnel Grid; Pl.'s Ex. 99, Nursery Duty Roster; Pl.'s Ex. 29, DeHaai medical records; Pl.'s Ex. 1, Government Admission Nos. 46, 63, dated 1/19/94. The defendant also admits that whatever happened to Jennifer DeHaai happened while she was under the exclusive care, custody and control of the defendant. Pl.'s Ex. 3, Government Admission No. 21, dated 8/26/94.

The Court finds, upon consideration of all the evidence, that the DeHaii infant was injured by the foreseeable actions of Beckelic.

### E. *TONYANIKA GIVENS,*
### *Case No. 93–D–1140–N*

The defendant's investigation into the injuries sustained by Tonyanika Givens is summarized in the OSI Report as follows:

A full-term, female infant born via normal vaginal delivery at 2159, 19 Sep 88. At 0035, 20 Sep 88, [Beckelic] wrote a nursing note that he found the infant choking at 2400, and a small amount of mucus, formula, and residual blood from birth was deleed from her. Mucus and formula were again deleed from her at 0200 on 21 Sep 88. At approximately 0300 21 Sep, the infant began gasping and became limp and cyanotic. Oxygen was administered, but the infant remained somewhat cyanotic. At about 0520, the infant's heart rate and respiration dropped drastically and a Code Blue was called. A review of AU Form 900, Code Blue Data Record, revealed Beckelic was listed as the first person on the scene and as a member of the resuscitation team. An AMBU bag was used to aid the infant's respiration using 100 percent oxygen. The infant remained blue and gaspy and was transferred to BMC at 0800, 21 Sep. Dr. Stigelman opined the infant's episode was consistent with lidocaine or bupivacaine toxicity but also noted the blood and mucus present in the infant prior to the event. Dr. Walsh noted this infant had an abnormal electroencephalogram (EEG) and would need close follow-up. Dr. Walsh estimated this infant's event to have occurred at about 0400, 21 Sep 88 (the 20 Sep 88 night shift). In addition to the Code Blue report, duty rosters showed Beckelic worked the 20 Sep 88 night shift.

Pl.'s Ex. 8, OSI Report at 10, 3–11. Dr. Walsh found no medically explainable reason for the Givens baby's episode, and concluded it was most likely a drug administered IV or IM. Pl.'s Ex. 161, Walsh Report. Dr. Stigelman agreed that the most likely cause of the Givens incident was the surreptitious administration of some exogenous agent such as lidocaine. Pl.'s Ex. 163, Dr. Stigelman Opinion.

Dr. Colan examined the Givens child and reviewed her medical records. Dr. Colan concluded that the injury to the Givens child was consistent with the administration of a toxic quantity of lidocaine. Pl.'s Ex. 70, Dr. Colan Depo., dated 3/3/94, at 17–19, 75, 128, 135, 147–48. Dr. Colan further observed:

Tonyanika had recurrent episodes which I believe occurred initially by something being put into her throat, that lidocaine was put into her by some feeding technique, such as an NG tube, and this caused her initial symptoms.... I believe that this case is the second case in which the child then received a major potentially lethal dose of lidocaine which produced the third event in the catastrophic change in this child. This child has cerebral palsy. Her right arm is paralyzed as an outcome.... The subsequent event with Tonyanika occurred with an IV and through an IV that was established after the first event.

*Id.* at 75–77; *see also* Pl.'s Ex. 71, Dr. Colan Depo., dated 6/6/94, at 129–137.

It is undisputed that Beckelic was on duty during the period in which Tonyanika was injured. Pl.'s Ex. 99, Nursery Duty Roster; Pl.'s Ex. 1, Government Admission Nos. 28 and 63, dated 1/19/94. Additionally, the medical records of September 20, 1988 indicate that Beckelic was present when the infant was choking at about midnight. When Tonyanika collapsed three hours later, Beckelic "discovered" the infant. Pl.'s Ex. 8, OSI

Report at 10. The defendant admits that whatever happened to Tonyanika Givens happened while she was under the exclusive care, custody and control of the defendant. Pl.'s Ex. 3, Government Admission No. 21, dated 8/26/94.

Mr. and Mrs. Givens filed an administrative claim and accepted a $25,000.00 payment from the Government on the Government's false representation that $25,000.00 was the maximum amount of recovery allowed in this type case. Pl.'s Ex. 192, Givens Depo. at 28–30; Court Order dated 10/2/95.

The Court finds, upon consideration of all the evidence, that the Givens infant was injured by the foreseeable actions of Beckelic.

### F. *COREY DEAN FOWLER, Case No. 93–D–1392–N*

The defendant's investigation into the circumstances surrounding the injury to Corey Fowler is summarized in the OSI Report as follows:

A full-term, male infant delivered by repeat (second child) c-section at 0839, 27 Sep 88. The birth was without incident or complication. The infant was noted to be well until 1900, 28 Sep 88, when the infant was discovered in his crib with bright red blood coming from his mouth and nose. Upon closer examination, a small (about 2 cm) laceration was found on the infant's upper palate. During the night, the infant had episodes of dusky color and was given oxygen. On 29 Sep 88, an Ear, Nose, and Throat (ENT) consultation was performed. At 1510, 29 Sep 88, Ms. Townsend, an LPN in the nursery found the infant again bleeding from the nose and mouth. The laceration was determined not to be the source of the bleeding, and another ENT consultation was requested. The infant was transported to BMC at 1200, 29 Sep 88. Dr. Walsh characterized the laceration to the infant's palate as suspicious and very unusual. Stigelman opined the infant's symptoms were not consistent with lidocaine or bupivicaine toxicity. Dr. Walsh estimated the time of this infant's event to be 1900, 28 Sep 88 (the 28 Sep 88 evening shift). A Newborn Assessment Record (AF 578 overprint) showed [Beckelic's] signature for 1630, 28 Sep 88. Duty

rosters showed [Beckelic] worked the 28 Sep 88 evening shift.

Pl.'s Ex. 8, OSI Report at 11, ¶¶ 3–11.

Although the method of operation used to injure the Fowler baby appears distinct from that used with the other plaintiffs, it is clear that he was, nevertheless, the victim of foul play. Dr. Colan opined with great conviction that the Fowler infant had been tampered with, concluding that "[i]t is inconceivable that anybody would have a laceration of the palate that was deep and that bled as much as much as this child bled on an incidental or accidental basis." Pl.'s Ex. 71, Dr. Colan Depo., dated 6/6/94, at 138. Dr. Walsh also characterized the laceration to the infant's palate as suspicious and very unusual. He concluded that the laceration was not a congenital defect and could only be "caused by direct injury to the roof of the baby's mouth." Pl.'s Ex. 161, Dr. Walsh's Letter dated 12/6/88. Dr. Walsh stated that there was no medical explanation for the injuries received to the Fowler baby. Pl.'s Ex. 161, Walsh Report.

Dr. Colan believes that the laceration of the Fowler baby's palate may have been caused by the injection of a toxic dose of lidocaine. Pl.'s Ex. 70, Dr. Colan Depo., dated 3/3/94, at 17–19, 128, 135, 147–48. He suggests the possibility of lidocaine because "irritability and cyanosis suggests the possibility of lidocaine exposure." *Id.* at 81. Although Dr. Stigelman does not believe that the Fowler baby's symptoms were consistent with lidocaine poisoning, he too believes Fowler's injuries were not the result of any medically explainable cause. Pl.'s Ex. 163, Stigelman's Opinion.

It is undisputed that Beckelic was on duty during both of the times the Fowler baby was injured, Pl.'s Ex. 11, Duty Roster; Pl.'s Ex. 1, Government Admission No. 63, at 21, dated 1/19/94; Pl.'s Ex. 3, Government Admission No. 5, at 2, dated 8/26/94; Pl.'s Ex. 100, Personnel Grid. Furthermore, in this case there is an adult eyewitness as to Beckelic's interaction with Fowler. LPN Townsend observed Beckelic hovering over Fowler immediately before one of the infant's bleeding incidents was discovered. Beckelic called

Townsend over and asked her to watch the baby. Beckelic then "disappeared." The Fowler infant was bleeding from the nose and mouth, and was cyanotic. Nurse Townsend noted that Beckelic failed to return, either to assist in the treatment of the baby, or to explain the circumstances surrounding the baby's injury. Pl.'s Ex. 60, Townsend Depo. at 23–24. *see also* Pl.'s Ex. 8, OSI Report at 25, ¶¶ 3–24.

The defendant admits that whatever happened to Corey Fowler happened while he was under the exclusive care, custody and control of the defendant. Pl.'s Ex. 3, Government Admission No. 21, dated 8/26/94. The Court finds, upon consideration of all the evidence, that the Fowler infant was injured by the foreseeable actions of Beckelic.

### G. CAMOI (JAMES) BARNES, Case No. 94–D–1393–N.

The defendant's investigation into the circumstances surrounding the injury to Camoi Barnes is summarized as follows:

A full-term, male infant delivered via c-section for fetal distress at 1507, 17 Nov 88. The infant was small for his gestational age. He progressed well until 1600, 20 Nov 88, when his temperature began to fall. Dr. Walsh later noted the infant was suffering from low blood sugar, profound metabolic acidosis, and was tachynapic at 1800, 20 Nov 88. He was given oxygen, and some improvement was noted. He began to exhibit seizure-like activity and was transferred to BMC at 2220, 20 Nov 88. Dr. Stigelman opined the infant's symptoms were not consistent with lidocaine or bupivicaine toxicity. Dr. Walsh opined the infant had suffered severe and probably permanent central nervous system damage, and he had experienced two suspicious episodes. The first was at 1800 and the second at 2130, 20 Nov 88 (the 20 Nov 88 evening shift). [Beckelic's] signature appeared on a 1630, 20 Nov 88, Newborn Assessment (AF 578) in the infant's medical record. Duty rosters showed [Beckelic] worked the 20 Nov 88 evening shift.

Pl.'s Ex. 8, OSI Report at 12, 3–11. Dr. Walsh believes Camoi Barnes' injuries were the result of a surreptitiously administered drug. Pl.'s Ex. 161, Walsh Report. Although Dr. Stigelman does not believe that Barnes' symptoms were consistent with lidocaine poisoning, he could not provide any medically explainable cause for Barnes' injuries. Pl.'s Ex. 163, Stigelman Opinion. Dr. Colan concluded that the symptoms exhibited by Barnes were consistent with lidocaine toxicity. Pl.'s Ex. 70, Dr. Colan Depo., dated 3/3/94, at 17–19, 128, 135, 147, 148; see also Pl.'s Ex. 71, Dr. Colan Depo., dated 6/6/94, at 86.

It is undisputed that Beckelic was on duty during the time Barnes was injured. Pl.'s Ex. 100, Personnel Grid; Pl.'s Ex. 99, Nursery Duty Roster; Pl.'s Ex. 3, Government Admission No. 12, dated 8/26/94. The medical records show that Beckelic conducted the newborn assessment of the child and was on duty when the incident occurred. Pl.'s Ex. 31, Barnes medical records. The defendant admits that whatever happened to Camoi Barnes happened while he was under the exclusive care, custody and control of the defendant. Pl.'s Ex. 3, Government Admission No. 21, dated 8/26/94.

The Court finds, upon consideration of all the evidence, that the Barnes infant was injured by the foreseeable actions of Beckelic.

### H. JOHN ROBERTS, Case No. 93–D–1139–N

The Government's investigation into the injury inflicted on John Roberts is summarized in the OSI Report as follows:

A full-term, male infant born via spontaneous vaginal delivery at 0210, 20 Nov 88. Several hours after giving birth and returning to her room, the mother suffered a seizure which was believed to be related to eclampsia (convulsions and coma suffered by pregnant women). At about 1100, 21 Nov 88, the infant's temperature went up slightly, and a sepsis workup was performed. The workup showed negative results. He was stable until about 1600, 22 Nov 88, when he had a brief episode of mottling and duskiness after vomiting formula. He was placed under oxygen. He had an episode of respiratory distress and duskiness at 1740 and again at 1823, 22

Nov 88. He developed tachycardia and was given epinephrine and lidocaine to improve his cardiac function. He was transferred to BMC at about 2000, 22 Nov 88. Dr. Stigelman opined the infant's symptoms were consistent with lidocaine or bupivicaine toxicity. Dr. Walsh opined the infant suffered from profound metabolic acidosis and believed the infant had severe and probably permanent central nervous system damage. He estimated the time of onset of the infant's episode was 1615, 22 Nov 88 (the 22 Nov 88 evening shift). (Note: Attachment 1 to Dr. Walsh's 6 Dec 88 report (Pl.'s Ex. 151; Walsh Report) contained a typographical error showing 21 Nov 88 as the day of the episode.) Duty rosters showed [Beckelic] worked the evening shift on 21 and 22 Nov 88;

Pl.'s Ex. 8, OSI Report at 12, 3–11;

In addition to concluding that Roberts was the victim of an IV or IM administered drug, Dr. Walsh opined that this child probably sustained permanent central nervous system damage. Pl.'s Ex. 161, Walsh Opinion; Pl.'s Ex. 8, OSI Report. Dr. Stigelman agreed that baby Roberts was most likely injected with some type of lidocaine or similar toxic drug. Pl.'s Ex. 163, Stigelman Opinion. Dr. Colan examined Roberts in September 1992 and, after a review of his medical records, concluded that Roberts' injuries were caused by a toxic dose of lidocaine. Pl.'s Ex. 70, Dr. Colan Depo., dated 3/3/94, at 17–19, 101–04, 128, 135, 147–48.

Once again it is undisputed that Beckelic was on duty when Roberts was injured, Pl.'s Ex. 1, Government Admission Nos. 36 and 63, dated 1/19/94; Pl.'s Ex. 99, Nursery Duty Roster, and alone with the plaintiff shortly before he was injured. Evidence was presented that it was Beckelic who "found" the injured infant plaintiff. See Young statement; Pl.'s Ex. 8, OSI Report at 20, ¶¶ 3–17. Dr. Colan, based on a review of the medical records, concluded Beckelic was alone with the baby at the time the incident occurred: "At 1630, the physician and nurse leave Beckelic in the position of being the sole supervisor for the child. And at 1712 when he is alone with the infant, suddenly there is another abrupt deterioration." Pl.'s Ex. 70,

Dr. Colan Depo., dated 3/3/94, at 102–103. Additionally, in this case, two eyewitnesses observed Beckelic with Roberts just prior to the time of injury. Medical Technician Julia Waites saw Beckelic alone with the Roberts infant just before the injury. Pl.'s Ex. 8, OSI Report at 28–29, ¶¶ 3–29. Airman Owen P. Nostrant told the OSI investigator that he saw Michael Beckelic alone with John Roberts just prior to the critical episode experienced by the baby. Pl.'s Ex. 8, OSI Report, at 32–33, ¶¶ 3–36. The defendant admits that whatever happened to John Roberts happened while he was under the exclusive care, custody and control of the United States defendant. Pl.'s Ex. 3, Government Admission No. 21, dated 8/26/94.

The Court finds, upon consideration of all the evidence, that the Roberts infant was injured by the foreseeable actions of Beckelic.

## I. ASIA MARIE SHARPE, Case No. 94–D–1201–N

The defendant's investigation into the circumstances surrounding the injury to Asia Marie Sharpe is summarized in the OSI Report as follows:

A full-term, female infant delivered by spontaneous vaginal delivery at 0038, 21 Nov 88. Meconium stain was present in the amniotic fluid. The infant had decreased fetal heart tones upon delivery and was given oxygen and Narcan (a drug to counteract the effects of narcotic anesthesia given the mother) for 10 minutes in the delivery room. At about 0300, the infant had tachynapea and oxygen was given. At about 1600, the infant had a septic workup and became mottled and started grunting and gasping. Dr. Stevenson was present at this time. The infant responded to stimulation and respiration assistance, and her color improved until about 1655 hrs when she had a period of mottling and decreased heart rate. The infant was transferred to BMC at 1755 after failing to respond to further treatment. Dr. Stigelman opined the infant's symptoms were consistent with lidocaine or bupivicaine toxicity. Lidocaine was found in the infant's urine at BMC, and there was no record of her receiving lidocaine directly

either at AURH or BMC. The infant's mother had received an unknown quantity of 1 percent lidocaine as a local anesthesia during her delivery on 21 Nov 88. The lidocaine present in the infant's urine could have been as a result of this lidocaine passing from the mother into the infant, or it could have been accidently injected into the infant during her episiotomy (widening of the vaginal opening to prevent tissue damage during birth). Dr. Walsh opined this infant suffered from profound metabolic acidosis and had an abnormal EEG which would require close followup. Dr. Walsh estimated the time of onset of this infant's episode was about 1615, 21 Nov 88 (the 21 Nov 88 evening shift). Duty rosters showed [Beckelic] worked the 21 Nov 8 evening shift.

Pl.'s Ex. 8, OSI Report. It is significant that, in the only plaintiff who had a urine screen, the presence of lidocaine (consistent with plaintiffs' theory) was discovered.[24] Pl.'s Ex. 160, Sharpe Urine Screen.

Dr. Walsh reviewed Sharpe's records and concluded that Sharpe's episodes were not medically explainable. Pl.'s Ex. 161, Dr. Walsh Report. He also stated that Sharpe had an abnormal elecepholagram and needed close followup. *Id.* Dr. Stigelman opined that the injuries to Sharpe were consistent with lidocaine poisoning. Pl.'s Ex. 163, Stigelman Opinion. Dr. Colan examined the Sharpe baby and reviewed all medical records. Dr. Colan opined that the injuries received by the Sharpe baby were consistent with the administration of lidocaine or other similar drug. Pl.'s Ex. 70, Dr. Colan Depo., dated 3/3/94, at 17–19, 108–09, 128, 135, 147–48.

In Dr. Stigelman's deposition, the question arose as to whether the lidocaine could have been transmitted from the mother to the infant during delivery as a result of the episiotomy. Since the urine screen was qua-

litative only (as opposed to being quantitative), Dr. Colan concluded that:

> there would have had to have been much, much, much more lidocaine in the baby than can possibly have occurred from an injection through the mother's skin over that period of time. The fact that it was positive at 31 hours shows there was a very high level of lidocaine in that baby prior to that examination. It proves that this child was intoxicated with lidocaine to still be positive at that point and is inconsistent with an escape from the mother into the baby.

Pl.'s Ex. 70, Dr. Colan Depo., dated 3/3/94, at 115–16. On the basis of this testimony, the Court finds that the lidocaine present in Sharpe's urine did not stem from the injection given to his mother.[25]

Deborah Sharpe, the mother of the child, identified Beckelic as being in the room shortly before the incident. Pl.'s Ex. 189, Sharpe Depo. at 12, 13. Moreover, it was Beckelic who called Nurse McCarty to look at the baby at the time of the code blue. Pl.'s Ex. 8, OSI Report at 20–22. All the evidence indicates that Beckelic was on duty at the time the child was injured. Pl.'s Ex. 99, Nursery Duty Roster; Pl.'s Ex. 100, Personnel Grid. Although the Hospital duty roster shows Beckelic was on duty during the shift in which the episodes to the Sharpe infant occurred, the defendant refuses to either admit or deny his presence. Nevertheless, the Court finds that Beckelic was present during the Sharpe episodes and that Sharpe's injuries occurred while he was under the exclusive care, custody and control of the defendant.

The Court finds, upon consideration of all the evidence, that Sharpe suffered her injuries while under the exclusive care, custody and control of the defendant. The Court further so finds that the Sharpe infant was injured by the foreseeable actions of Beckelic.

24. A urine screen was done on one other infant who suffered similar injuries at the Hospital. As might be expected, this urine screen revealed that lidocaine was present in the child's system. This child, Dease, settled his claim administratively.

25. Furthermore, the defendant effectively eliminated any opportunity to establish conclusively the source of the lidocaine (through further testing) when it failed to comply with its own regulations and preserve Sharpe's urine sample.

## J. EMILY ANN ROBERTS, Case No. 93–D–1391–N

The medical records of Emily Roberts show that she was a term child, born on July 20, 1988 at 1:13 P.M. She was noted to be active and vigorous at birth. Pl.'s Ex. 3, Government Admission Nos. 12–14, dated 8/26/94. At 4:10 a.m. on July 22, 1988 she was found to be cyanotic. Pl.'s Ex. 3, Government Admission 15, dated 8/26/94.

Beckelic was alone with Emily Roberts on at least two occasions when she suffered cyanotic events. Beckelic "found" and reported that the child was cyanotic in the early morning hours of Beckelic's July 21–22 shift. At about 4:00 a.m., Beckelic again reported an episode of cyanosis and described the child as not breathing. According to Beckelic, he "stimulated the child." Pl.'s Ex. 25, Medical Records of Emily Roberts. It is undisputed that Beckelic was on duty at the time the child suffered her injuries. Pl.'s Ex. 3, Government Admission No. 17, dated 8/26/94; Pl.'s Ex. 99, Nursery Duty Roster; Pl.'s Ex. 100, Personnel Grid.

Although Dr. Walsh opined that Emily Roberts' injuries *could possibly* have a medical explanation, he also stated that it was possible the child's injuries were caused by smothering. *See* Pl.'s Ex. 161, Dr. Walsh Report. On the other hand, Dr. Colan said Emily was definitely tampered with. Dr. Colan was not certain whether the child's injuries were related to a toxic dose of lidocaine. Pl.'s Ex. 71, Dr. Colan Depo., dated 6/6/94, at 200. The child's mother, Mrs. Roberts, was told by Colonel Jones, the Hospital commander, that her child was one of several that had been injected with a drug. Pl.'s Ex. 182, Terry Roberts Depo. at 9–11, 20–26.

The Court finds, upon consideration of all the evidence, that Roberts suffered her injuries while under the exclusive care, custody and control of the defendant. The Court further so finds that the Roberts infant was injured by the foreseeable actions of Beckelic.

## K. QUINTON WARRICK, Case No. 94–D–1199–N

The medical records show that Quinton Warrick was born on the 29th of August, 1988. His birth weight was 3465 grams. He had an initial apgar score of 9 and was described as being vigorous and doing well. Pl.'s Ex. 47, Warrick Medical Records; *see also* Pl.'s Ex. 70, Dr. Colan Depo., dated 3/3/94, at 70, 71. Shortly after midnight on October 30, 1988, infant Warrick had an acute episode of duskiness, cyanosis, blueness, gray and mottled appearance and lethargy. He was slow to respond to oxygen and an IV was started. Shortly thereafter, at 0600 hours, a code blue was called. The child had extreme cyanosis, blueness and his heart rate was in the 40's and 50's. He was resuscitated with oxygen, a tube was put in his throat, and atrophine was given to speed up his heart rate. His arterial blood gas, according to Dr. Stevenson, showed acidosis some 40 minutes after his code blue. He was transferred to BMC for observation. At BMC, he had an abnormal EEG. Pl.'s Ex. 47, Warrick Medical Records; Pl.'s Ex. 70, Colan Depo., dated 3/3/94, at 70–72.

Dr. Walsh characterized the Warrick episode as "suspicious." By that, he meant "there are underlying causes or subsequent information which *could possibly* explain the episode." Pl.'s Exs. 161, 162, Walsh Reports. However, Dr. Colan concluded that the Warrick infant had been injected with lidocaine through the IV which was put in place subsequent to his first episode. Pl.'s Ex. 70., Dr. Colan Depo., dated 3/3/94, at 71–73.

The evidence indicates that Beckelic was on duty during both episodes in which Warrick became cyanotic. Pl.'s Ex. 100, Personnel Grid; Pl.'s Ex. 99, Nursery Duty Roster. The presence of Michael Beckelic at the time of these episodes is further confirmed by the deposition testimony of Daphne Warrick. Mrs. Warrick stated that on the morning of the episode, she was told by Michael Beckelic that Quinton Warrick was hyperventilating and that he was "giving them a good fit after the spinal tap." Pl.'s Ex. 187, Daphne Warrick Depo. at 8. The Court finds that Warrick suffered his injuries while under the exclusive care, custody and control of the defendant.

The Court finds, upon consideration of all the evidence, that the Warrick infant was

injured by the foreseeable actions of Beckelic.

### L. AARON GOGGANS, Case No. 94-D-1200-N

The medical records of Infant Goggans show that he was a full-term male infant delivered without complications by c-section on December 9, 1988 at the Hospital. Pl.'s Ex. 4, Government Admission No. 1, dated 3/13/95. Aaron Goggans' medical records were not reviewed by Drs. Walsh and Stigelman. However, Dr. Colan had an opportunity to review Goggans' records, and he physically examined Goggans on March 2, 1994. Pl.'s Ex. 70, Dr. Colan Depo., dated 3/3/94, at 118.

Based on this examination and review, Dr. Colan opined, to a reasonable degree of medical certainty, that Aaron Goggans was tampered with on December 9, 1988. *Id.* at 122. Dr. Colan stated that, although Aaron Goggans did not demonstrate the symptoms of those children he believed to have been subjected to lidocaine toxicity, it was possible that Goggans had been injected with some other drug. Dr. Colan suggested that certain heavy metals could produce the symptoms exhibited by Aaron Goggans. Pl.'s Ex. 71, Dr. Colan Depo., dated 6/6/94, at 201–203.[26]

There is some dispute as to whether Beckelic was on duty at the time Goggans was injured. The Hospital duty roster initially produced by the defendant showed that Beckelic was on duty during the time Goggans was injured. Pl.'s Ex. 99, Nursery Duty Roster. Later, the defendant *changed* the duty assignment and time schedule roster by deleting Beckelic's name. Pl.'s Ex. 99, Nursery Duty Roster. Thereafter, the defendant amended its "Admission No. 70" (the defendant had initially claimed to have insufficient information to admit or deny) to deny Beckelic's presence in the nursery at the time. The defendant's inconsistent position is even more questionable in light of the trial testimony of Ms. Goggans, Aaron Goggans' grandmother. Ms. Goggans stated that she saw Beckelic in the nursery immediately after the child's birth, and that Beckelic physically handed the baby to his mother following the baby's circumcision. *See* Goggans trial testimony; Pl.'s Ex. 197, Connie Mullen Depo.; Pl.'s Ex. 207, Aff. in Support of Aaron Goggans' Federal Tort Claim. The Court finds Ms. Goggans to be a credible witness. Finally, it is clear that, despite the defendant's assertion to the contrary, Beckelic was allowed to work at the hospital during December of 1988, and thus, had access to the nursery during the period when Goggans was injured. Pl.'s Ex. 99, Nursery Duty Roster; PX 107, final APR. Based on the foregoing, the Court finds that Goggans has established that Beckelic was present at the time the child suffered injury.

The Court finds, upon consideration of all the evidence, Goggans suffered his injuries while under the exclusive care, custody and control of the defendant. The Court further so finds that the Goggans infant was injured by the foreseeable actions of Beckelic.

### III. DISCUSSION

As noted earlier, the plaintiffs bring their claims under the Federal Torts Claims Act ("FTCA"), 28 U.S.C. § 1346. The FTCA provides that the tort law of the state where the act or omission occurred governs liability. 28 U.S.C. § 1346(b); *Bettis v. U.S.*, 635 F.2d 1144 (5th Cir.1981); *Edwards v. U.S.*, 497 F.Supp. 379 (M.D.Ala.1980). It is undisputed that the alleged acts or omissions of the defendant occurred within the State of Alabama. *See Ross v. United States*, 640 F.2d 511, 518–19 (5th Cir.1981). However, the defendant contends that it is immune to the plaintiffs' claims pursuant to 28 U.S.C. § 2680(a) (discretionary function) and

---

**26.** Dr. Colan's review of Goggans' records revealed that, while in the nursery, the Goggans baby appeared unusually irritable. Although the irritability had subsided by the time the child was released from the Hospital, once home, the irritability returned and the baby began to have seizures. Pl.'s Ex. 71, Dr. Colan Depo., dated 6/6/94, at 201–02. Dr. Colan believes that these symptoms are consistent with the injection of some type of heavy metal. *Id.* at 202. Thus, while the wrongdoer's method of operation may have changed, Dr. Colan was of the opinion that, Goggans, like the other plaintiffs, suffered injury because he was tampered with, i.e., because someone intentionally injected him with a toxic dose of some heavy metal.

§ 2680(h) (intentional tort). The Court will address these contentions separately.

### Intentional Tort Defense

The defendant contends that it cannot be liable under the FTCA because the plaintiffs' claims necessarily arise out of a clam for battery. Section 2680(h) of Title 28 of the United States Code provides that sovereign immunity is not waived for "any claim arising out of assault, battery" or other enumerated intentional torts. Thus, the issue before the Court is whether the plaintiffs' claims arise out of Beckelic's battery upon the plaintiffs.

■ The defendant's argument misinterprets the plaintiffs' claims. The plaintiffs seek recovery, not for Beckelic's intentional acts, but for the defendant's breach of the duty of care it owed the plaintiffs. This case is not so much about what Beckelic did, as it is about what the defendant failed to do. The Court, upon consideration of all the evidence, finds that the defendant failed to exercise reasonable care in its decision to assign Beckelic to the nursery; the defendant failed to adhere to its own regulations regarding quality assurance and documentation; the defendant failed to adhere to its own regulations regarding supervision in the nursery; the defendant failed to identify the cause of the plaintiffs' injuries and take steps to prevent recurrence thereof; and the defendant ignored both direct and indirect warnings about Beckelic's unsuitability for placement in the nursery.[27] This type of claim is not excepted from the waiver of sovereign immunity found in 28 U.S.C. § 1346(b). *See Sheridan v. United States,* 487 U.S. 392, 108 S.Ct. 2449, 101 L.Ed.2d 352 (1988); *United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963).

In *Sheridan,* the Supreme Court was faced with this same issue in a case factually analogous to the instant case. In *Sheridan,* three naval corpsmen found a naval medical aide "lying face down in a drunken stupor on the concrete floor of a hospital building." 487

U.S. at 395, 108 S.Ct. at 2452. The corpsmen initially tried to get the aide to the emergency room, but fled when the aide resisted and it was revealed that the aide was armed with a rifle. *Id.* The corpsmen failed to report this incident to the appropriate authorities. *Id.* Later that night, the aide fired his rifle into a passing car, injuring one of the passengers. *Id.*

Petitioners brought a claim under the FTCA alleging that their injuries were caused by the Government's negligence. *Id.* at 394, 108 S.Ct. at 2451–52. The courts below dismissed the petitioners' claim because it implicated an intentional tort by a Government employee. *Id.* at 395, 108 S.Ct. at 2452. The *Sheridan* Court began its discussion by noting, "it is both settled and undisputed that in at least some situations the fact that an injury was directly caused by an assault or battery will not preclude liability against the Government for negligently allowing the assault to occur." *Id.* at 398, 108 S.Ct. at 2454 (citing *United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963)). The Court added that even if an intentional tort was "a sine qua non of recovery," recovery under the FTCA was not precluded pursuant to § 2680(h). *Id.* at 400, 108 S.Ct. at 2454.

The Court held that § 2680(h) did not preclude recovery from the government for the intentional tort of its employee acting outside the scope of his or her duty. *Id.* at 401, 108 S.Ct. at 2455. The Court expounded on its holding by addressing the question of whether the Government owed the petitioners a duty that arose independent from the aide's status as a Government employee.[28] The Court stated that "[b]y voluntarily adopting regulations that prohibit the possession of firearms on the naval base and that require all personnel to report the presence of any such firearm, and by further voluntarily undertaking to provide care" to the aide, the Government had assumed a duty of due care to the petitioners. *Id.* at 401, 108 S.Ct. at

---

27. *See* discussion of breach *infra.*

28. In so doing, the Court clearly left the heart of § 2680(h), the prohibition of suits arising out of an intentional tort brought under a theory of respondeat superior, intact. *See United States v.*

*Shearer,* 473 U.S. 52, 55–57, 105 S.Ct. 3039, 3041–43, 87 L.Ed.2d 38 (1985); *Miami North, Inc. v. U.S. Dept. of Labor,* 939 F.Supp 53, 56 (D.Maine 1996).

2455. Thus, the employment status of the petitioners' assailant had nothing to do with the duty owed by the Government; the petitioners' theory of liability was analogous to those cases in which a person assumes control of a vicious animal or explosive device. *Id.* at 403, 108 S.Ct. at 2456. The Court noted that where the assailant's employment status is irrelevant to the theory of liability, it would be "perverse to exonerate the Government" because the assailant is a federal employee. *Id.* at 402, 108 S.Ct. at 2456. Therefore, the Court concluded, "[b]ecause neither [the aide's] employment status nor his state of mind has any bearing on the basis for petitioners' claim for money damages, the intentional tort exception to the FTCA is not applicable in this case." *Id.* at 403, 108 S.Ct. at 2456.

▬▬▬ Like *Sheridan,* the defendant in the instant case owed a duty of care to the plaintiffs independent of Beckelic's status as an employee. Under Alabama law the defendant owed the plaintiffs a general duty of care in the administration and operation of the Hospital and a duty to protect against the foreseeable criminal acts of third parties.[29] Further, the defendant voluntarily adopted regulations governing the operation of the Hospital and nursery which inure to the benefit of the plaintiffs. The Court finds that the defendant owed the plaintiff these duties independent of Beckelic's status as a Government employee. Accordingly, the Court finds that the plaintiffs' claims fall

outside the exception provided in § 2680(h).[30] *See Bembenista v. U.S.,* 866 F.2d 493, 497–98 (D.C.Cir.1989) (holding that Government could be liable where a blind plaintiff, in a comatose or semi-comatose state, was sexually assaulted by a medical technician while in an Army hospital); *Mulloy v. United States,* 884 F.Supp. 622, 631–32 (D.Mass.1995) (finding that Government could be liable for wrongful death claim by decedent's estate where Government negligently performed background screening and enlisted assailant into the Army); *see also Doe v. United States,* 838 F.2d 220, 223 (7th Cir.1988) (holding the plaintiffs' claims arise when the defendant breaches its duty, and the facts of the assault merely go to the measure of damages).

### Discretionary Function Defense

The defendant further contends that plaintiffs' claims are barred as they are based upon the performance of a discretionary function. Section 2680(a) provides that the FTCA does not apply to any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

▬▬▬ The application of the discretionary function exception is determined by a two-part test: (1) whether the conduct involves

---

**29.** *See* discussion of duty *infra.*

**30.** The plaintiffs contend, in part, that the defendant was negligent in the hiring, employment, training and/or supervision of Beckelic. In Alabama, an employer is held responsible for a servant's incompetency when notice or knowledge, actual or presumed, of unfitness has been brought to the attention of the master. *Thompson v. Havard,* 285 Ala. 718, 235 So.2d 853, 858 (1970). The master is charged with knowledge of the employee's incompetence if the master, through the exercise of due and proper diligence, would have discovered the employee's incompetence. *Id.*

Where skill and capacity are required to accomplish an undertaking, it is negligence for a master not to employ servants having sufficient qualifications for the undertaking. *Hathcock v. Mitchell,* 277 Ala. 586, 173 So.2d 576, 584 (1965). The tort of negligent hiring, training or

supervision goes beyond the actual assault of a plaintiff if the defendant employer had "received other complaints concerning [the employee] and had not acted." *City of Huntsville v. Davis,* 456 So.2d 69, 71 (Ala.Civ.App.1983); *rev'd on other grounds,* 456 So.2d 72 (Ala.1984).

In *Sheridan,* the Supreme Court expressly declined to address whether a claim for negligent supervision, hiring or training could provide a basis for liability under the FTCA. 487 U.S. at 403 n. 8, 108 S.Ct. at 2456 n. 8; *but see* 487 U.S. at 406–07, 108 S.Ct. at 2457–58 (Kennedy, J. concurring) ("If the allegation is that the Government was negligent in the supervision or selection of the employee and that the intentional tort occurred as a result, the intentional tort exception of § 2680(h) bars the claim."). Because the Court finds that the defendant is liable under both of the plaintiffs' other theories, the Court declines to decide whether the plaintiffs' negligent supervision and hiring claim is viable.

an element of judgment or choice and (2) whether the judgment is the type Congress sought to protect. *Powers v. United States,* 996 F.2d 1121, 1124–25 (11th Cir.1993). Where specific regulations govern a course of action, the discretionary function exception does not apply. *Id.* at 1124.

 In the instant case, the Court finds from a consideration of all the evidence that the defendant's negligence stems, in part, from its failure to adhere to its own voluntarily created regulations. Further, the Court finds that the defendant failed to comply with Joint Commission of Accreditation for Hospitals ("JACH") standards which are made applicable by Air Force regulations. In failing comply with these regulations, the defendant was not exercising discretion. In other words, the defendant's failure to comply with specific regulation cannot be deemed a discretionary act. Furthermore, the Court finds that the negligent actions at the Hospital do not implicate decisions "grounded in social, economic, and political policy," and thus, are not the type of actions Congress intended to protect. *Id.* at 1125. Accordingly, the Court finds that the discretionary function exception does not bar the plaintiffs' claims.[31]

## A. Negligence

 Under Alabama law, a plaintiff seeking to recover for negligence must offer proof of the following elements: (1) the standard of care; (2) a breach of the standard of care; (3) that the breach of the standard of care proximately caused the complained-of injury; and (4) the existence and extent of the injury. *Ranger Ins. Co. v. Hartford Steam Boiler Inspection & Ins. Co.,* 410 So.2d 40, 41 (Ala. 1982); *Salter v. United States,* 880 F.Supp. 1524 (M.D.Ala.1995). Of course, "[n]o tort exists when no legal duty is owed from the alleged tortfeasor to the party claiming injury." *Ranger,* 410 So.2d at 42 (citation omitted).

### 1. Duty

 The Court finds that as a matter of law the defendant owed the plaintiffs a duty of care under two distinct theories.[32] First, it is clear that under Alabama law, a hospital owes a general duty of care to its patients. *See* § 6–5–484 Ala.Code (1993);[33] *Lamont v. Brookwood Health Servs. Inc.,* 446 So.2d 1018, 1020 (Ala.1983). More precisely, the defendant owed the plaintiffs a duty to "exercise that degree of care, skill, and diligence had and exercised by those hospitals engaged in the same kind of operation, in similar conditions or under similar circumstances." *Lamont,* 446 So.2d at 1020. The essence of this duty is to provide patients with an environment where their health and safety needs can best be addressed. This broad, general duty of care may include numerous specific activities such as compliance with applicable hospital admin-

---

**31.** *See Collazo v. United States,* 850 F.2d 1, 3 (1st Cir.1988) ("Where only professional, nongovernmental discretion is at issue, the discretionary function does not apply.")

**32.** The plaintiffs advanced a third theory of liability—that the defendant owed them a duty because it had "special knowledge" of a criminal threat to their well-being. Alabama law will support such a theory when the "volume and nature of the criminal activity" is sufficient to show that the defendant could have foreseen that the danger to the plaintiffs was an imminent probability. *Webster v. Church's Fried Chicken, Inc.,* 575 So.2d 1108, 1109 (Ala.1991). While the precise amount of prior criminal activity necessary to support liability is unclear, it is unquestionably a high hurdle. *See Webster,* 575 So.2d at 1109–10 (cataloging cases); *accord Nail v. Jefferson County Truck Growers,* 542 So.2d 1208 (Ala.1988) (criminal activity foreseeable); *Facemire v. Konover Management South,* 804

F.Supp. 1465 (S.D.Ala.1992) (actual knowledge made criminal activity foreseeable). Because the plaintiffs clearly prevail on their other theories of liability, the Court declines to decide whether the plaintiffs have sustained their burden under this theory.

**33.** "In the case of a hospital rendering services to a patient, the hospital must use that degree of care, skill, and diligence used by hospitals generally in the community." § 6–5–484(a) Ala.Code (1993). Section 6–5–484 was supplemented by the Alabama Medical Liability Act of 1987 which provides in part, "[t]he standard of care is that level of such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice, ordinarily have and exercise in like cases." § 6–5–542(2) Ala.Code (1993). The community being referenced in § 6–5–484(a) is the national hospital community. *Lamont v. Brookwood Health Srvcs., Inc.,* 446 So.2d 1018, 1020 (Ala.1983).

istration standards, the existence of an adequate quality assurance program, and proper training and supervision of Hospital staff.[34]

Second, the defendant in this case owed the plaintiffs a duty to protect them from the foreseeable criminal acts of third parties. *See Young v. Huntsville Hospital,* 595 So.2d 1386 (Ala.1992). Young sued the hospital for injuries she suffered as the result of a sexual assault by a trespasser. *Id.* at 1387. The *Young* Court noted the general rule that "'absent special relationships or circumstances,'" hospitals have no duty to protect their patients from the criminal acts of third parties. *Id.* However, the court found that, because Young may have been sedated at the time of the attack, she had a "special relationship or circumstance" with the hospital. *Id.* at 1388. The court applied a "dependence test" to determine whether Young's situation constituted a special relationship. *Id.* at 1389. The court stated "we can hardly imagine a situation in which a person is more dependent on another for basic bodily protection and care than the situation of an anesthetized or sedated patient." *Id.* Therefore, the court held that the hospital owed Young a duty of care, and that it was for the trier of fact to determine the issue of foreseeability. *Id.*; *see* discussion of foreseeability *infra.*

Although the Alabama Supreme Court did not imagine it, the facts of this case present a situation in which the need for protection is even more compelling than in *Young.* A newborn infant is utterly helpless, totally dependent on others for health, safety and protection.[35] Accordingly, the Court finds as a matter of law that the Hospital owed the plaintiffs a duty to protect them from the reasonably foreseeable criminal acts of third parties. *See Bembenista v. United States,* 866 F.2d 493, 498 (D.C.Cir.1989).

### 2. Standard of Care

To establish the standard of care to which the Hospital must adhere, the plaintiffs offered the deposition testimony of William Nellis. Mr. Nellis has worked in hospital administration in management since 1962 and has published numerous articles on the subject of hospital administration. Pl.'s Ex. 56, Nellis Depo. at 15–29. Mr. Nellis' opinion is based upon a reasonable certainty or reasonable probability within the field of hospital management, risk management and quality control. *Id.* at 97. The Court finds that Mr. Nellis is an expert in the field of hospital administration.

Mr. Nellis offered his opinion on what constitutes "accepted practice" for similarly situated hospitals in the community. Essential to the establishment of a safe and nurturing environment, Mr. Nellis stated that accepted practice requires the existence and function of a quality assurance program. *Id.* at 98–99, 107, 110, 127–128, 136, 139–141. Concomitant with the creation of a quality assurance program is the designation of a quality assurance supervisor whose primary function is to insure quality control and to prevent foreseeable mishaps. *Id.* It is the mission of the quality assurance program and the duty of the quality assurance supervisor to identify and take the steps necessary to prevent recurring medical problems. Accepted practice requires a hospital to manage risk so that similar medical problems do not reoccur. *Id.* at 147.

---

**34.** Based upon the testimony of plaintiffs' experts in hospital administration and nursing, *see infra* discussion of duty, the Court finds these activities exemplify part of the defendant's general duty of care. *See Rosemont Inc. v. Marshall,* 481 So.2d 1126, 1129–30 (Ala.1985) ("To establish a hospital's negligence under the Alabama Medical Liability Act, ordinarily, the plaintiff must offer expert medical testimony ... An exception to the foregoing general rule has been recognized where the want of skill or lack of care is so apparent as to within the comprehension of the average layman.") It should be noted that the failure to reasonably perform *any one* of these activities could form the basis of a negligence

claim. As such, these examples may be sufficient, but are not necessary, to establish that the Hospital breached the general duty of care it owed the plaintiffs.

**35.** While this conclusion is self-evident to the Court, Nurse Townsend's testimony lends further support. She agreed that a newborn baby depended upon the nursery staff for basic bodily protection. She could think of no more helpless and dependent situation than that of a newborn baby in a hospital nursery. Pl.'s Ex. 60, Townsend Depo. at 70–72.

Mr. Nellis stated that it is accepted practice for the head of a department and the medical staff to monitor the activities of its section to insure quality care and service to its patients. With respect to the nursery, Mr. Nellis stated that it is accepted practice that a nursery in a Level I hospital be staffed by a registered nurse. *Id.* at 98, 99, 107, 110, 139. If a hospital fails to staff its nursery with a registered nurse, the hospital must insure that there is direct supervision over whoever staffs the nursery. Mr. Nellis stated that direct supervision requires physical presence in the immediate proximity of the nursery to provide direct supervision of people who have limited qualifications. *Id.* at 117.

In addition to Mr. Nellis' testimony on the Hospital's standard of care, the plaintiffs pointed out various regulations relevant to the Hospital's operation. The defendant, through the United States Air Force, assumed the mission and responsibility of operating a regional hospital at Maxwell Air Force Base to provide medical care to Air Force personnel and dependents. Pl.'s Ex. 11, AFR 168–4 (C3), Ch. 2. The Hospital is required to comply with all standards set forth in the JCAH publication, "Accreditation Manual For Hospital." Pl.'s Ex. 11, Air Force Regulation ("AFR") 168–4 (7), Ch. 4.

The objective of medical administration, in addition to surgical and medical matters, is to provide 24–hour skilled nursing coverage throughout the hospital. The fulfillment of this objective requires the relay of accurate and concise information between the administrative nurse on call and the evening night supervisor. Furthermore, all personnel are required to insure that all appropriate information be relayed to the chief of the nursing services regarding incidents occurring on each shift. Pl.'s Ex. 13, SGHN OI 168–1. Reports and documentation of unusual incidents are mandatory. The administrative nurse on call must be called regarding any serious incident. Any evidence of child abuse, neglect or aggravated assault must be documented. *Id.* at 168–2.

The regulations provide that the defendant has a duty to insure that medical technicians are adequately prepared to assume whatever responsibilities they are assigned. Pl.'s Ex. 16, SGHN OI 168–26. If a medical technician performs a procedure for which he or she has not received formal training, such procedure must be performed in the presence of a qualified trainer. Under no circumstances may a medical technician prescribe or dispense medication, nor may a medical technician perform surgical procedures. *Id.*

There are extensive regulations pertaining to reporting and documentation. The Hospital staff is required to maintain formal, thorough, written documentation on Hospital activities. Pl.'s Ex. 11, AFR 168–4(C3) at 712–715. For example, an incident statement (AF Form 765) must be completed to document any event which is inconsistent with routine care. The incident statement must be routed, without delay, to the risk manager for review and appropriate investigation. A 24–hour report (AF Form 587) must be completed and should include any life threatening or unusual incidents. *Id.* at 7–15. The 24–hour report is specifically required to be completed by the nursery staff. The importance of accurate and efficient documentation from the nursery is emphasized by the following Air Force policy statement: "An infant is at risk for injury before delivery and throughout its hospital stay. Infant safety must be considered at all times when providing care for the newborn." SGHN 2 Nursery OI 127–1.

Of course, documentation is of little use if the Hospital fails to efficiently review and respond to reported problems. The regulations require that the Hospital, as part of its risk management activities, identify and track documented problems, and develop an appropriate response thereto. Pl.'s Ex. 10, AFR 168–13 at 23–25. The nursing service is specifically required to identify, assess and resolve any problem areas. The nursing service is charged with the specific duty of resolving a problem so that "there is no reasonable chance of reoccurrence during the current year." *Id.* at 35. *All evidence which bears upon a fair adjudication of potential malpractice claims must be preserved.* Pl.'s Ex. 10, AFR 168–13 at 16, 17 (emphasis added).

The plaintiffs offered a second expert, Nurse Elizabeth McPherson, to establish that the applicable standards of care were breached in the Hospital.[36] Ms. McPherson testified that JCAH and Air Force Standards impose a duty on the government to allow only competent personnel with a commitment to the welfare of the patient to administer medical attention to infants in a Level I nursery setting. Pl.'s Ex. 57, McPherson Depo. at 91.

Ms. McPherson agreed with Mr. Nellis on the importance of an adequate quality assurance/risk management program. She testified that an essential element of quality assurance is the ongoing identification of existing or potential problems through systematic review of health care services. *See id.* at 233. The Court finds that Ms. McPherson is a credible witness.

### 3. Breach

■ The evidence that the defendant failed to perform its duties and breached its standard of care is overwhelming, and the Court so finds. The plaintiffs' expert, Mr. Nellis, pointed out many of the Hospital's deficiencies. Mr. Nellis stated that the medical care or hospital management practiced at the Hospital was *grossly* inconsistent with the standard of care reasonably expected by hospitals operating Level I nurseries in the general medical or hospital community. Pl.'s Ex. 56, Nellis Depo. at 98. Mr. Nellis opined that, foremost amongst the defendant's breaches, the Hospital did not have a quality assurance program during 1988, or, if it did have such a program, it failed to adequately perform any important functions. *Id.* at 98–99, 107, 110, 127–128, 136, 139–141.

The defendant's breach is reflected by the plaintiffs' injuries. The plaintiffs' injuries were the unusual, severe, patterned type of injuries that a properly functioning quality assurance/risk management program should have addressed. In Mr. Nellis' opinion the Hospital breached its duty of care by failing to, in a timely manner, identify severe medical problems of a repetitive nature, determine the source of these problems, and fashion an effective response to these problems. *Id.*

The evidence reveals that, in fact, the Hospital *did not* perform quality assurance activities in conjunction with the events in the nursery during 1988. Plaintiff Pretiger's experience is a glaring example of the Hospital's failure. Pretiger actually observed and identified medical technician Beckelic tampering with her IV just before she lost consciousness. Although Mrs. Pretiger was questioned extensively by OSI investigators, neither the director of quality assurance, Colonel Sadick, nor the quality assurance coordinator, Mrs. Welch, ever investigated the Pretiger incident.[37] Pl.'s Ex. 53, Sadick Depo. at 60–61, 154. Colonel Sadick admits that he did not call in medical experts to investigate any of the plaintiffs' injuries prior to the time that Drs. Walsh and Stigelman were called in to coordinate with the OSI investigation. Finally, Colonel Sadick testified that neither he nor Mrs. Welch had completed, in connection with the events of 1988, any of the forms normally associated

---

36. The Court finds that Ms. McPherson is an expert in nursing administration and management. Ms. McPherson has been employed in the area of nursing administration since 1967, and among other things, she has been a clinical educator and clinical nursing director at Georgetown University Hospital. Pl.'s Ex. 57, McPherson Depo. at 49, 54–55, 71–72.

37. Colonel Sadick testified as follows:

> Q. Colonel Sadick, did you conduct an investigation surrounding the events complained of by Mrs. Pretiger?
> A. I don't recall that, sir.
> Q. Did you direct that Ms. Lucy Welch conduct such an investigation?
> A. I do not recall that either.
> Q. Did you refer the incident to the United States Attorney's Office for criminal investigation?
> A. No, sir.
> Q. Did you call in Beckelic and question him concerning the allegation?
> A. No, sir, I did not.
> Q. Did you make any notation in any record that Beckelic was involved in this alleged incident with Ms. Pretiger?
> A. No, sir, not to my knowledge.
> Q. Did you run any tests or order any tests be run to determine whether any drugs would be found in Ms. Pretiger's system?
> A. No, sir. No, sir.
> Pl.'s Ex. 53, Sadick Depo. at 60, 61, 154.

with a quality assurance investigation.[38] Upon consideration of the evidence, particularly the testimony of Mr. Nellis,[39] Colonel Sadick and Mrs. Welch,[40] and the OSI report, the Court finds that there was no quality assurance investigation at the Hospital in connection with the events which occurred in 1988.[41] Accordingly, the Court finds with emphasis that the defendant breached its duty of care with respect to hospital administration and management.[42]

Further evidence of this breach may be seen in the woefully deficient documentation performed in the Hospital. Mr. Nellis noted that the infant plaintiffs' medical records fail to include significant information which, by JCAH standards, must be included. Pl.'s Ex. 56, Nellis Depo. at 185–186. Other mandatory documentation, such as quarterly reports and the minutes from committee meetings, are also missing.[43] The Court finds that if the defendant had followed reasonable documentation procedures and adequately monitored this information, it would have known of the problems in the nursery and had an opportunity to prevent their recurrence. *See id.* at 162. Further, the Court finds that the defendant exhibited a pattern of neglect in not identifying and assessing medically significant information.

**38.** Colonel Sadick testified that he was familiar with the Form 3219 which is a quality assurance data collection form used in quality assurance investigation. Pl.'s Ex. 53, Sadick Depo. at 83. However, he testified that he did not recall Form 3219 ever being completed in connection with the events that occurred at the Hospital in 1988:

> Q. During 1988, did you cause or direct the completion of a QA Data Collection Form 3219 on any of these babies?
> A. Not that I recall, sir.

*Id.* at 84. Colonel Sadick also testified that he did not recall completing, in connection with these incidents, any of the other quality assurance forms associated with a quality assurance investigation:

> Q. In 1988 did you complete or direct the completion of Air Force 2376, which is a Quality Assurance Problems Status Record?
> A. I don't recall, Mr. Beck.
>
> \* \* \* \* \* \*
>
> Q. Do you recall completing a Quality Assurance Monitoring and Evaluation Form No. 950 on any of these children in 1988?
> A. No, sir, I do not.
> Q. Do you recall completing or directing the completion of the Medical Quality Assurance Occurrence Screening Checklist, sides one and two, which is Air Force Form 2374, on any of these nursery babies?
> A. No, sir, I do not.
> Q. And do you recall completing or directing the completion of Air Force Form 2375, which is a QA Practitioner Occurrence Screening Summary, on any of these babies in 1988?
> A. No, sir, I do not.

*Id.* at 85–86. Colonel Sadick did not dispute Dr. Walsh's statement that there were no quality assurance forms upon which to conduct the OSI Investigation. *Id.* at 86.

**39.** Mr. Nellis pointed out that there was no evidence that anyone in the Hospital was "tracking" the incidents which were causing life threatening events and/or the unusual transfer rate among infants in the nursery. Pl.'s Ex. 56, Nellis Depo. at 212.

**40.** Mrs. Welch had previously stated that she had absolutely no knowledge of a quality assurance investigation into the 1988 events. *See* Pl.'s Ex. 64, Walsh Depo. at 15–16, 54–55, 76–79; Pl.'s Ex. 58, Jones Depo. at 57, 58, 76, 77.

**41.** The defendant attempts to point to Dr. Walsh's report dividing the plaintiffs into three categories ("A," "B" and "C") as evidence that a quality assurance investigation did indeed take place. However, this argument is refuted by the unrebutted fact that Colonel Sadick disclosed the results of Dr. Walsh's report to the parents of the plaintiffs. Pl.'s Ex. 53, Sadick Depo. at 67–69, 79–80. If Dr. Walsh's report had been part of a quality assurance investigation, Colonel Sadick would not have been permitted to disclose the report to the parents or to anyone else. The fact that Colonel Sadick, Director of Quality Assurance ("QA"), disclosed Dr. Walsh's report in 1989 is compelling evidence that the Air Force did not, at that time, consider the report part of a QA investigation. Astoundingly, the first and only attempt to characterize Dr. Walsh's report as a QA document was made, not by the QA director or by the Air Force, but *by the defendant's attorneys* in the summer of 1994, six years after it was first disclosed, and four years after the first of these lawsuits were filed.

**42.** Mr. Nellis identified a number of specific standards, pertaining to quality assurance and risk management, prescribed by the applicable regulations which were violated in the Hospital. Mr. Nellis stated that the standards contained within MS.3.9, which sets out the responsibilities of the department chairman, were breached. Mr. Nellis stated that MS.6.1 through MS.6.1.7.2, which require effective mechanisms to monitor and evaluate the quality and applicability of patient care and the clinical performance of all individuals with delineated clinical privileges, were violated. Pl.'s Ex. 56, Nellis Depo. at 148–152.

**43.** *See* Pl.'s Ex. 10, AFR 168–13, Attachment 4, at 91–92.

Mr. Nellis pointed out some of the ways in which the defendant breached its duty in and around the Hospital nursery. The defendant breached the applicable standard of care by allowing an aide (Beckelic) to staff the nursery.[44] This breach was made even worse by failing to assure that Beckelic had direct supervision. Pl.'s Ex. 56, Nellis Depo. at 115–16.[45] Mr. Nellis testified that the physical layout of the Hospital nursery made it difficult to provide a medical technician such as Beckelic with the necessary direct supervision. *See id.* at 116. The Court finds from a consideration of all the evidence that the defendant breached the standard of care by staffing the nursery with an unsupervised medical technician and by failing to remove him in the face of adequate warning signals. *Id.* at 98–99, 107, 125, 127; *see also* McPherson Trial testimony.

The plaintiffs' other expert, Nurse McPherson, concurred that the defendant violated applicable regulations when it transferred Beckelic to the nursery. Pl.'s Ex. 57, McPherson Depo. at 91. Ms. McPherson stated that the defendant violated its duty of care by allowing a person with Beckelic's history of psychological and emotional instability to work in the nursery. *See id.* at 91–101.[46] Ms. McPherson stated that the defendant further breached its standard of care by failing to document and monitor Beckelic's psychological and emotional problems. *See*

*id.* at 122–126. Ms. McPherson concluded that the defendant breached its duty to provide quality nursing care to the infant plaintiffs. *Id.* at 136–137.

Ms. McPherson agreed with Mr. Nellis that the quality assurance/risk management performed at the Hospital was insufficient, if not non-existent. Ms. McPherson stated that the defendant violated JACH and Air Force standards by failing to monitor, screen and investigate the infant crashes beginning in February of 1988. *See id.* at 197–221. Like Mr. Nellis, Ms. McPherson noted the absence of any of the quality assurance documents which would normally be generated in connection with an investigation into unusual medical incidents. *See id.* at 202–09, 220–30.

Ms. McPherson further testified that an essential element of quality assurance is the ongoing identification of existing or potential problems through systematic review of health care services. The defendant breached this duty by failing to define and identify problems; when problems arose that had no medically explainable cause, the defendant had a duty to look for other causes, such as chemical or intentional actions. *Id.* at 233, 235. Ms. McPherson states that, in this case, drug screening should have been ordered on the infant plaintiffs, or, at the minimum, the nurses should have discussed this course of action with the physicians. *See id.* at 233–

---

**44.** The defendant's breach is compounded in this case by the fact that this was not a typical, well-qualified medical technician. As noted earlier, Beckelic had a history of psychological and emotional problems, which if properly monitored and documented, should have prevented him from being assigned to the nursery or should have mandated very close monitoring. Pl.'s Ex. 56, Nellis Depo. at 165–170. Denise Womack's failure to document information pertaining to Beckelic's emotional and psychological stability was also a breach of the applicable standard of care. *Id.* at 200.

Moreover, Beckelic's qualifications as a medical technician are somewhat suspect. To be certified to perform various medical procedures, a medical technician must, under supervision, perform that procedure satisfactorily three times. Beckelic's record is devoid of documentation which would support certification. Furthermore, a medical technician is forbidden from dispensing medication. *See* Pl.'s Ex. 16, SGN OI 168–26.

**45.** Mr. Nellis went on to state that adequate staffing and supervision by a registered nurse would likely have prevented the criminal acts that took place in the nursery, and certainly would have identified any such activity at an early stage allowing the Hospital to take the steps necessary to avoid reoccurrence. Pl.'s Ex. 56, Nellis Depo. at 98–99, 107, 110, 139.

The lack of direct supervision in the nursery made accurate and thorough documentation of any unusual incident all the more critical. Thus, the Hospital's inadequate documentation practices were exacerbated by its breach of care in the nursery. *Id.* at 162–163.

**46.** Ms. McPherson noted that in addition to Beckelic's psychological history, the defendant had twice received direct notice of Beckelic's unsuitability for duty in the nursery. Both Sergeant Davis and Nurse Townsend voiced their opposition to Beckelic's placement in the nursery prior to his transfer. *See* Pl.'s Ex. 57, McPherson Depo. at 129–130; *see also* discussion of foreseeability *infra*.

238. Upon consideration of all the evidence, the Court finds that the defendant breached its duty of care as described by Ms. McPherson.

### 4. Foreseeability of the Plaintiffs' Injuries

■ To recover under their second theory of liability, the plaintiffs must prove that their injuries stemmed from the reasonably foreseeable criminal acts of Beckelic. The evidence presented by the plaintiffs not only sustains this burden, it further demonstrates how the defendant breached its general duty of care to the plaintiffs.[47]

The Court upon consideration of all the evidence finds that Beckelic's criminal conduct was reasonably foreseeable by the defendant. *See Young,* 595 So.2d at 1389 (conduct foreseeable if the general risk of such conduct is foreseeable) (citation omitted). The plaintiffs' experts made it clear that, had the defendant acted with reasonable care, it would have identified the threat in the nursery before any of the plaintiffs were injured. Mr. Nellis testified that as early as June 1988, the frequency and similarity of the injuries made the injuries suffered by the plaintiffs reasonably foreseeable. Pl.'s Ex. 56, Nellis Depo. at 221.

Mr. Nellis further expressed his opinion that the injuries suffered by each Plaintiff were reasonably foreseeable and likely preventable but for the flagrant disregard of basic risk management and quality assurance standards at the Hospital. *Id.* at 99. Mr. Nellis highlighted a fifteen day period in 1988 during which four children experienced unexplained ALTE's as an example of the total breakdown in Hospital management.

Ms. McPherson testified that the defendant's breach of the standard of care, as described throughout, caused all of the unexplainable ALTE's after July 8, 1988. She stated that a reasonable adherence to the standard of care would have prevented the injury to Emily Roberts (the first of the plaintiffs injured) and Aaron Goggans (the last of the plaintiffs injured). Pl.'s Ex. 57, McPherson Depo. at 267–68.

The Hospital was warned both directly and indirectly that Beckelic was a potential danger to Hospital patients and was completely unsuitable for placement in the nursery. Considered together with Beckelic's mental health history,[48] the Court finds that the defendant should have perceived the danger of placing Beckelic in the nursery or that the defendant should have recognized, prior to the time the first plaintiff was injured, the danger Beckelic presented to Hospital patients and assigned him elsewhere.

The Hospital was indirectly warned by Beckelic's wife. As noted earlier, Beckelic's wife informed Denise Womack, Beckelic's immediate supervisor, that she was afraid of Beckelic because of his uncontrollable temper. Pl.'s Ex. 54, Womack Depo. at 33–36. When Womack confronted Beckelic he admitted that his temper was, at times, uncontrollable. Clearly Womack took these statements seriously as she advised Beckelic to seek mental health counseling. *Id.* at 38, 39.

Unfortunately, Womack kept these revelations to herself. She did not inform her supervisors. She failed to document Beckelic's and his wife's statements. *Id.* at 78–81. Womack did not follow up on her referral of Beckelic to mental health counseling. Ironically, when she evaluated Beckelic in his annual performance rating ("APR") at the end of 1988, Womack gave Beckelic the highest rating possible. *Id.* at 170–175. Nowhere in the APR was there any documentation concerning Beckelic's mental health. *Id.* at 143–145.

It is clear that Beckelic was not able to segregate his mental and emotional problems from his work at the Hospital. Beckelic's fellow employees recognized his emotional instability. *See* Pl.'s Ex. 97, summary of

---

47. As noted earlier, the unusual ALTE's at the Hospital began occurring in February 1988; the earliest injury to a plaintiff in this case was in July 1988.

48. The Court emphasizes that a person is not rendered incompetent to perform all tasks simply because that person has a mental health history,

e.g., counseling and/or medication. Instead, reasonable care requires an employer to consider an employee's acts in light of all relevant information. Thus, Beckelic's mental health history became relevant as the Hospital learned (or should have learned) about Beckelic's disconcerting behavior.

fellow employee observations. Beckelic himself expressed frustration with his duty assignment in the nursery. Pl.'s Ex. 236, MCMI Answer Sheet dated 6/10/88.

The Hospital received a direct warning about Beckelic from Sergeant Tom Davis who was Beckelic's immediate supervisor in the surgical unit (the unit to which Beckelic was assigned before being transferred to the nursery). Sergeant Davis observed Beckelic on a daily basis. Pl.'s Ex. 63, Davis Depo. at 7–8. He noted that Beckelic displayed a general lack of concern for the patients. In fact, Sergeant Davis went so far as to state that he believed Beckelic did not have a conscience. *Id.* at 22. Sergeant Davis communicated these concerns to assistant superintendent of nursing services, Brazier, stating that Beckelic should be dismissed from the medical corps, or discharged from the Air Force entirely. *Id.* at 20–22. Furthermore, Sergeant Davis communicated his firm belief that Beckelic was capable of hurting a patient, specifically telling Brazier not to let Beckelic into a position where he could hurt somebody, *Id.* at 25–27. Sergeant Davis remembers documenting his concerns, but, like other pieces of critical evidence, this documentation has mysteriously vanished. *Id.* at 20. The Court finds Sergeant Davis' testimony credible.[49] It is significant to note that Sergeant Davis documented and communicated his concerns about Beckelic *before* Beckelic was transferred to the nursery.

The Hospital was also warned about Beckelic by LPN Townsend, who worked with Beckelic in the surgical unit. Townsend's interactions with Beckelic convinced her that Beckelic was not trustworthy. Pl.'s Ex. 60, Townsend Depo. at 10–12. She communicated her feelings to the non-commissioned officer in charge of the surgical unit, stating specifically her belief that Beckelic should not be transferred to the obstetrics ward (the nursery). *Id.* at 12.

In retrospect, the commanding officers at the Hospital recognize the danger created by placing Beckelic in the nursery. Dr. Sadick, head of Quality Assurance at the Hospital, stated that had he known of Beckelic's emotional instability, Beckelic would have never been allowed to work in the hospital, much less the nursery. Pl.'s Ex. 53, Sadick Depo. at 109, 111. Colonel Sadick observed that when Beckelic was removed from the nursery, the rash of mysterious injuries stopped. Pl.'s Ex. 101, Sadick Aff. Of course, if the defendant had not breached its duty of care with respect to documentation and communication, Colonel Sadick would have known about Beckelic's instability. Further, Colonel Jones, Hospital Commander, stated, to his credit, that had Beckelic been removed from the nursery earlier, the injuries to the plaintiffs would likely have been prevented. Pl.'s Ex. 58, Jones Depo. at 67. The Court agrees and finds from a consideration of all the evidence that Beckelic's criminal conduct was entirely foreseeable.

In summary, the Court finds from a consideration of all the evidence that the defendant has breached the duty of care it owed to the plaintiffs in the following ways:

1. The defendant staffed the nursery with an unsupervised medical technician.

2. The defendant staffed the nursery, despite direct and indirect warnings, with a person who exhibited mental and emotional instability.

3. The defendant failed to document and monitor Beckelic's psychological and emotional instability.

4. The defendant blatantly failed to perform a quality assurance investigation in connection with the events which occurred at the Hospital in 1988.

5. In 1988, the defendant was grossly negligent in the operation of the quality assurance/risk management program at the Hospital. The negligent operation of these

**49.** In his deposition, Sergeant Davis was asked about an evaluation of Beckelic which bore Sergeant Davis' signature and which allegedly gave Beckelic high marks. Sergeant Davis indicated that he signed the form in blank, that it was not supposed to apply to Beckelic, and that he was not Beckelic's rater. Sergeant Davis averred that he did not write any of the comments in the evaluation. Pl.'s Ex. 63, Davis Depo. at 14–17. While the Court does not condone the practice of signing blank forms, the Court does not find that this practice impeaches Sergeant Davis' testimony regarding Beckelic's mental stability.

programs caused the defendant to fail to identity Beckelic as the cause of the plaintiffs' injuries, and prevented the defendant from taking remedial action prior to the date the first plaintiff was injured.

6. The defendant failed to comply with applicable Air Force and JCAH regulations/standards regarding documentation and review of information. Compliance with these standards would have made the defendant aware of the danger Beckelic represented to the plaintiffs.

## B. DEFAULT

The plaintiffs contend that they have been irreparably prejudiced by the defendant's destruction of critical evidence. They ask that the Court impose the most serious sanction, default on the defendant. *See Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1556 (11th Cir.1986) *cert. denied,* 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986); *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107 (S.D.Fla.1987). Because the Court finds that the plaintiffs have established the defendant's liability by an overwhelming prepon-

derance of the evidence, the Court need not decide whether default is an appropriate sanction under the present circumstances.[50]

Nevertheless, it is clear to the Court that the defendant destroyed evidence which would have aided the plaintiffs in their effort to recover damages.[51] Therefore, the plaintiffs may be entitled to some form of sanctions for the defendant's destruction of critical evidence. This issue should be addressed during the next phase of the proceedings.

## *ORDER*

In CONSIDERATION of the foregoing discussion, the Court ORDERS the following:

(1) That the Clerk withhold final judgment in this matter pending the findings of the special master, to be appointed in a separate order, on the issues of proximate cause and damages;

(2) that within thirty days of the receipt of this memorandum opinion and order, the parties engage in face to face settlement negotiations and that a report of the same be filed with the Court;

---

**50.** It does not appear initially that the defendant's conduct rises to the level of culpable conduct required in the Eleventh Circuit to warrant an entry of default judgment. *See EEOC v. Jacksonville Shipyards, Inc.*, 690 F.Supp. 995, 998 (M.D.Fla.1988); *but see Gates Rubber Co. v. Bando Chemical Indus. Ltd.*, 167 F.R.D. 90, 103–04 (D.Colo.1996) ("in some circumstances, it would not improper for a court to order dispositive sanctions for negligent conduct").

**51.** The testimony of Colonel Sadick illustrates the nature of the evidence lost due to the defendant's failure to comply with its own regulations:

Q. And isn't it a fact that anytime there's a suspected claim, you're supposed to preserve all evidence and documentation that might lead both to the prosecution and defense of that claim?
A. Yes, sir.
Q. Have you made any effort to preserve any QA form, any documents, or any piece of evidence that connects to any of the incidents involving these children in 1988?
A. Other than a routine business way of preserving forms and documents, I've done nothing further than that, sir.
Q. Well, let me make sure. As far as any of the incidents that occurred to the babies in the nursery in 1988, is it your testimony that you did not specifically direct Lucy Welch to save all QA forms?
A. I specifically do not remember that, sir.

Q. Did you or did you not inform anyone in the nursing staff or the nursery staff to preserve bottles of lidocaine found in the nursery?
A. No, sir.
Q. Did you advise them to preserve syringes found in the nursery?
A. No, sir.
Q. Did you advise them to preserve and maintain bloody gauze found in the wastebasket in the nursery during 1988?
A. No, sir.
Q. Do you know of any evidence that you asked them to preserve concerning what might have happened to these children in 1988?
A. Not that I can recall, sir.
Q. Do you recall that in 1988, a sample of lidocaine—excuse, a test for lidocaine was done on the Sharpe baby that found lidocaine in her system? Do you recall that?
A. Down at Baptist Hospital, sir?
Q. Yes.
A. Yes, sir, I do.
Q. And did you ask that that sample be preserved?
A. No, sir, I do not recall that.
Q. Did you order any quantitative tests be run on that sample?
A. No, sir, I cannot recall that either.
Pl.'s Ex. 53, Sadick Depo. at 89–93.

(3) that the Clerk direct the U.S. Marshall to personally serve a courtesy copy of this opinion on Lieutenant General Joseph J. Redden, the Commander of Headquarters Air University at Maxwell Air Force Base, Montgomery, AL; Colonel William S. Cole, Jr., 42nd Air Base Wing Commander at Maxwell Air Force Base, Montgomery, AL; Colonel Scott B. McLauthlin, Staff Judge Advocate for Air University at Maxwell Air Force Base, Montgomery, AL; Colonel R.A. Henrikson, Commander of the 42nd Medical Group at Maxwell Air Force Base, Montgomery, AL; and Major David F. Brash, Staff Judge Advocate for the 42nd Air Base Wing at Maxwell Air Force Base, Montgomery, AL.